AMELIA SOLOMON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 97937. Promulgated January 7, 1941.

*W. A. Seifert, Esq., W. W. Booth, Esq., R. L. Kirkpatrick, Esq.,* and *A. G. Wallerstedt, C. P. A.,* for the petitioner.
*William S. Schmitt, Esq.,* for the respondent.

OPINION.

Mellott: Petitioner contends that a complete and irrevocable gift. of the trust corpus was made on October 9, 1928, vesting an estate, measurable in value, in a named class of beneficiaries, and the only right of which she divested herself on May 10, 1935, was the right to demand that the income be paid to her for life; that she, in 1928, contributed only approximately one-third of the trust corpus, her son, H. Alfred, having contributed the other two-thirds; and, if she is determined to have made a gift of trust corpus in 1935, that the gift, at most, was of only one-third. These contentions will be considered in the order stated.

According to the trust instrument petitioner and her husband "delivered to and deposited with" the trustee securities which, on the date of the death of the husband, had a fair market value of $375,996.46. They reserved the right "to modify, alter, amend or extend the terms" of the trust, "in whole or in part and to change the beneficiaries." The gift, therefore, was not complete until this power terminated or was relinquished. *Burnet* v. *Guggenheim*, 288 U. S. 280; *Porter* v. *Commissioner*, 288 U. S. 436; *Estate of Sanford* v. *Commissioner*, 308 U. S. 39. Petitioner attempts to distinguish the instant proceeding from the *Sanford* case upon the ground that she and her husband reserved only the power to designate which of a class should have the corpus of the trust upon its termination, whereas, she says, the donor in the cited case could designate any beneficiary other than himself. We can not spell out of the trust instrument before us any such limitation as petitioner contends exists; and it may be pointed out that in the *Sanford* case the great grandchildren of the settlor— descendants *per stirpes* of the named grandchildren who were the life

beneficiaries—constituted a "class" just as much as the "living lawful issue" of the children of petitioner and her husband.

No useful purpose would be served by discussing at length petitioner's argument upon the first portion of the contention now under consideration. It is sufficient to state that, in our opinion, the settlors, so long as both lived, could have designated anyone other than themselves to receive the corpus of the trust, under the broad powers retained. We, therefore, hold that no estate, measurable in value, passed to their grandchildren upon the creation of the trust. The remaining portion of petitioner's first contention will be considered later.

Over the objection of counsel for the respondent petitioner was permitted to introduce certain evidence tending to prove her contention that she, in 1928, contributed only approximately one-third of the trust corpus, her son, H. Alfred, contributed two-thirds and her husband, Max, contributed nothing. Upon brief she states that it makes no difference, as she views the case, whether it be held that the son or the husband made the contribution. It is essential, however, that determination be made whether she contributed more than one-third.

Notwithstanding the evidence introduced by petitioner, we are of the opinion and have found as a fact that she and her husband each contributed 50 percent of the corpus. This conclusion is based upon many factors, some of which will be specifically referred to later. But first the evidence relied upon by petitioner to prove that her son, H. Alfred, contributed two-thirds of the securities to the corpus of the trust will be summarized.

The evidence consisted of the testimony of H. Alfred and an accountant; pages from a ledger in which had been entered descriptions of securities, dates purchased, prices paid and kindred information—but not by whom purchased; bank books showing the deposits of income received; pages from a memorandum book kept by H. Alfred; several checks written by petitioner, H. Alfred or Max Solomon; and two memoranda prepared by the accountant in collaboration with H. Alfred, based partially upon an analysis of the exhibits referred to above and partially upon information furnished by H. Alfred. One memorandum purports to list "Securities Contributed by H. Alfred Solomon" and the other "Securities Contributed by Amelia Solomon."

H. Alfred testified that his father during his lifetime had engaged in the scrap iron and steel business and had been very successful; that when his father had any excess profits which he did not need in his business he either bought bonds or made a gift to his wife in cash; that in 1922 petitioner gave him approximately $500,000 in securities; that his father gave him approximately $40,000 or $50,000 in securities in 1922, 1923, and 1924; that he lived at home with his parents until 1930; that he was present when his father and mother signed the trust agreement in 1928; that he delivered most of the

securities mentioned in the trust agreement to the trustees; that he got these securities from safety deposit boxes held jointly in the names of his mother and father and himself; that he kept the books and records for his mother and father and himself, showing the ownership of such securities; and that after his father's death he had reason to trace the ownership of all of the securities held under this trust. When asked the reason for doing so, he replied:

After Dad's death the Government assessed inheritance tax on the entire corpus of this trust, so, on advice of counsel, we decided to go to the books of records and make up a list of securities to show the Government the ownership of the securities; who owned the securities, and that Dad never contributed anything to the trust.

The accountant testified that in February 1934 he assisted H. Alfred in the preparation of a list of the securities which were deposited with the trustee in October, 1928; that later, prior to the execution of the instrument by petitioner and H. Alfred in 1935, the list was revised to determine definitely the ownership of the securities; that the witness examined principal and income books kept by H. Alfred; that the principals of petitioner and H. Alfred were kept in one book; that being informed that H. Alfred had received about $500,000 in securities from his mother in 1922, he attempted to trace the securities to find if any of them went to the trustees in 1928; that after locating the securities in the principal book, he made an investigation to determine who received the income from them prior to 1928 by tracing the income from the securities to the bank account in which it had been deposited; and that he thus determined that, of the securities originally deposited in the trust, one-third belonged to petitioner and two-thirds to H. Alfred. He also testified that he was not a lawyer. Petitioner was not called as a witness and the testimony set out above was the only evidence bearing upon this phase of the proceeding.

According to the memoranda prepared by the accountant the securities transferred to the trust on October 9, 1928, cost $382,207.79. Securities costing $23,567.36 appear to have been paid for with checks signed by Max Solomon; securities costing $93,081.31 with checks signed by petitioner; and securities costing $96,866.56 with checks signed by H. Alfred. The accountant was unable to determine whose checks were issued to pay for the remaining securities, the total cost of which was $178,692.56. It is interesting to note, however, that he included in the list of "Securities Contributed by Amelia Solomon" securities which were paid for by checks signed by H. Alfred Solomon totaling $19,711.61, and securities having an aggregate cost of $62,956.79 as to which no evidence was adduced showing who had purchased them. He also included in the list of "Securities Contributed by H. Alfred Solomon" securities which were paid for by checks signed by Max

Solomon totaling $23,567.36, by petitioner totaling $41,318.26, and securities having an aggregate cost of $115,735.77, as to which no evidence was adduced in the hearing before us to show who had purchased them. It is apparent, therefore, that the accountant's determination as to who was the contributor or owner of each security transferred to the trust in 1928 was not based upon checks issued in payment for the securities at the time of their purchase. From an examination of the schedules and his testimony, we are satisfied that his determination was based primarily upon the fact that the income from the securities listed on the H. Alfred schedule, during the period subsequent to their acquisition and prior to the transfer in trust, had been deposited in a bank account in the name of H. Alfred and recorded as his income in the books which he kept.

We are not convinced from the evidence that H. Alfred, on October 9, 1928, was the owner or contributor of any of the securities transferred to the trust on that date. The schedule, which petitioner contends shows the securities contributed by H. Alfred, lists 35 securities purchased between May 1918 and December 1927. H. Alfred appears to have been born in 1900, so he, during this period, was between 18 and 27 years of age. Ten of the securities were purchased prior to 1923 and the remainder subsequent thereto at a total cost of $257,776.34. Of this amount, securities costing $77,154.95 were paid for with checks signed by H. Alfred, $41,318.26 by checks signed by petitioner, and $23,567.36 by checks signed by Max Solomon. It will be noted that securities costing $115,735.77 are not accounted for. For aught that appears in this record they may have been purchased either by petitioner or her husband. At any rate, the evidence is far from sufficient to prove that H. Alfred acquired the ownership of the securities costing $180,621.39 ($257,776.34 — $77,154.95) ; and his testimony that he received gifts of securities from his parents in 1922, 1923, and 1924 is not helpful in view of his failure to identify the securities received. Moreover, the mere fact that H. Alfred received the income from some of the securities during the period subsequent to their purchase and prior to the execution of the trust does not necessarily indicate that he was the owner of them. It is not unusual for parents to give their child or children income from securities, and at the same time retain the ownership of them.

But even if it be assumed that H. Alfred became the owner of some of the securities prior to their transfer in trust, we are not convinced that he did not surrender such ownership to one or both of his parents prior to the execution of the agreement on October 9, 1928. He was present when his mother and father executed the agreement. According to his testimony, he took the securities from safety deposit boxes held jointly in the names of his mother and father and himself and delivered them to' the trustee. He knew that his mother and

father were assuming dominion and control over them and irrevocably transferring title to them to a trustee, reserving only the right to modify and amend the trust instrument and to change the beneficiaries of income and principal. Why did he remain silent when this was being done? He kept the books and records from which he says ownership can be traced. If they now show that he was the owner of two-thirds of the securities transferred to the trust they must have reflected this ownership on October 9, 1928. As the keeper of these books, and the person who delivered the securities to the trustee, he must have been aware of the fact, if it were a fact, that his securities were being transfered by his parents to a trust over which he was to have no control, two-thirds of the income of which was to be paid to his brother and sister. If he intended to be a contributor to this trust, why did he not insist that his name appear as such on the trust instrument? And why did he permit his father's name to appear as a contributor if in fact his father made no contribution whatsoever? If he were an undisclosed contributor of two-thirds of the trust corpus, why did he permit his parents to punish him by depriving him of any income from the securities deposited with the trustee from November 24, 1930, to November 23, 1932? The record does not contain the answer to these questions. A reasonable inference from all of the facts seems to be either that he did not own two-thirds of the securities on October 9, 1928, or, if he did, that he surrendered such ownership to one or both of his parents on that date. At any rate, upon the evidence before us, we can not find as a fact that H. Alfred, after October 9, 1928, had any interest in the trust other than as stated therein. Our conclusion is that the only contributors to the trust corpus on October 9, 1928, were the individuals named in the trust instrument, viz., the petitioner and her husband, and we have made a finding to that effect.

When we come to determine the fractional proportion contributed to the trust by petitioner and her husband, the evidence set out above serves both to confound us and to confirm our opinion that they contributed approximately equal amounts. Our conclusion is strengthened by the language of the trust instrument; the joint dominion and control which petitioner and her husband exercised over the property prior to the creation of the trust; their treatment of the income from the trust and especially their withdrawal of H. Alfred's share; the practice of the husband of expending his excess profits in the purchase of bonds or giving cash to his wife to be so expended; the fact that the securities were contained in safety deposit boxes to which each had access; and the presently stipulated fact that "one half of the corpus * * * was included by the Commissioner * * * in the gross estate (of the husband) subject to federal estate tax and tax paid thereon." It has accordingly been found as a fact that petitioner

and her husband each contributed 50 percent of the corpus of the trust on October 9, 1928.

Respondent starts with the premise that petitioner and her husband each contributed 50 percent of the corpus to the trust in 1928. Nevertheless he argues that "the quantum of the gift (made by petitioner in 1935 when she relinquished the retained powers) was the entire principal." This may be considered in conjunction with the contentions of petitioner heretofore referred to but not discussed.

The stipulation does not indicate the reason 50 percent of the fair market value of the trust corpus on the date of the husband's death was included in his gross estate. We assume that it was because of section 302 (d) of the Revenue Act of 1926, under which the estate tax is imposed upon the value of the interest "of which the decedent has at any time made a transfer, by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power, either by the decedent alone or in conjunction with any person, to alter, amend or revoke * * *." Cf. *Porter* v. *Commissioner, supra.* By a parity of reasoning, the other 50 percent would probably have been includable in the gross estate of petitioner if, peradventure, she had died simultaneously with her husband or if the death of both had occurred under such circumstances that it was impossible to ascertain which died first. We are not called upon to decide this question, nor need we express an opinion as to the correctness of including any portion of the corpus in the gross estate of the deceased husband. Our question is: Did petitioner's relinquishment of the power to modify, alter, and amend the terms of the trust subject all, one-half, or none of the corpus to the gift tax under Title III of the Revenue Act of 1932?

Section 501 (a) of the Revenue Act of 1932 imposes the tax "upon the transfer * * * by any individual, * * * of property by gift." It seems to be clear that Congress intended to impose the tax upon the *donor* just as it intended to impose the estate tax under section 302 (d), *supra,* upon the *transferor.* This is apparently the view taken by the respondent in the promulgation of his regulations; for in article 3 of Regulations 79, 1936 Ed., it is stated: "* * * the tax is a primary and personal liability of the *donor,* is an excise upon his act of making the *transfer,* is measured by the value of the property passing from the *donor* * * *. As to any property * * * of which the *donor* has so parted with dominion and control as to leave in him no power to cause the beneficial title to be revested in himself, the gift is completed." (Italics ours.) Congress evidently intended to tax—perhaps could only constitutionally tax—the value of the property passing from the donor. This seems to be the substance of the regulation. What, then, passed from petitioner? She says

only a life estate in the property contributed by her. Respondent says all of the property comprising the corpus on May 10, 1935.

Having decided that no complete gift of the corpus was made in 1928, we think it is reasonable to hold, and we do hold, that petitioner made a gift when she, in 1935, relinquished the retained power. *Burnet* v. *Guggenheim, supra; Estate of Sanford* v. *Commissioner, supra.* This comes literally within section 501 (c) of the Revenue Act of 1932.[1] We do not agree with respondent's contention, however, that all of the property then comprising the corpus became subject to the gift tax.

The property contributed to the trust by petitioner's husband became, upon his death, subject to the exercise by her of a general power. If she had not relinquished it the value of the property at the time of her death would have been includable in her gross estate under section 302 (f) of the Revenue Act of 1926.[2] Nevertheless we do not believe that her relinquishment of the power in 1935 subjected that portion of the property to a gift tax against her.

Section 302 (f), *supra*, first became a part of the revenue act in 1919. Prior thereto the department, by regulation, had required all property passing under a general power of appointment to be included in the gross estate of the decedent "appointor." In *United States* v. *Field*, 255 U. S. 257, the Supreme Court held the regulation to be invalid and that the interest there in question, not having been the property of the decedent appointor at the time of her death nor subject to distribution as part of her estate, was not taxable under section 202 (a) or 202 (b) of the Revenue Act of 1916. The Court pointed out that "it would have been easy for Congress to express a purpose to tax property passing under a general power of appointment exercised by a decedent had such a purpose existed." Since it had not done so the court applied the "accepted canon that the provisions of (tax imposing) acts are not to be extended by implication." *Gould* v. *Gould*, 245 U. S. 151.

It need not be determined in this proceeding whether Congress has the power to subject to the gift tax property passing through the relinquishment, by one other than the donor, of a power given to him by the donor. It is sufficient to point out, as the Supreme Court

---

[1] (c) The tax shall not apply to a transfer of property in trust where the power to revest in the donor title to such property is vested in the donor, either alone or in conjunction with any person not having a substantial adverse interest in the disposition of such property or the income therefrom, but the relinquishment or termination of such power (other than by the donor's death) shall be considered to be a transfer by the donor by gift of the property subject to such power, and any payment of the income therefrom to a beneficiary other than the donor shall be considered to be a transfer by the donor of such income by gift.

[2] (f) To the extent of any property passing under a general power of appointment exercised by the decedent (1) by will, or (2) by deed executed in contemplation of, or intended to take effect in possession or enjoyment at or after, his death, except in case of a bona fide sale for an adequate and full consideration in money or money's worth ; * * *

did in the *Field* case *supra*, that Congress has not endeavored to subject such a transaction to the gift tax. Moreover, it is also not without significance that the Department has promulgated no regulation attempting to subject the relinquishment of such power to the gift tax, as it has done in connection with the estate tax. Indeed it is doubtful if such a power is either a property right or an interest in property, cf. *Farmers Loan & Trust Co.* v. *Bowers*, 29 Fed. (2d) 14, 17, a prerequisite, it would seem, to including it in "property transferred by gift."

We are of the opinion and hold that one-half of the presently stipulated value of the corpus of the trust on May 10, 1935, and no more, should be included in the total amount of gifts made by petitioner during the year 1935.

*Decision will be entered under Rule 50.*