JOSEPH GOLDSTEIN, TRANSFEREE, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 80834–80837, 80843–80845, 89376. Filed February 9, 1962.

---

[1] Proceedings of the following petitioners are consolidated herewith : Joseph Goldstein, Transferee, Docket No. 80835 ; Miriam Goldstein Sommer, Transferee, Docket No. 80836 ; Miriam Goldstein Sommer, Transferee, Docket No. 80837 ; David I. Goldstein, Transferee, Docket No. 80843 ; Estate of Annie Goldstein, Deceased, Nathan E. Goldstein, Executor, Transferee, Docket No. 80844 ; David I. Goldstein, Transferee, Docket No. 80845 ; and Nathan E. Goldstein, Docket No. 89376.

*Norman B. Asher, Esq.*, for the petitioners.
*James E. Markham, Esq.*, for the respondent.

OPINION.

DRENNEN, *Judge:* In Docket No. 89376, respondent determined deficiencies in gift tax due from petitioner Nathan E. Goldstein and additions to tax for the taxable years and in the amounts as follows:

| Year | Deficiency | Additions to tax | |
|---|---|---|---|
| | | Sec. 3612(d)(1), I.R.C. 1939 | Sec. 6651(a), I.R.C. 1954 |
| 1940 | $57.75 | $14.44 | |
| 1942 | 944.91 | 236.23 | |
| 1944 | 4,513.92 | 1,128.48 | |
| 1945 | 462.19 | 115.55 | |
| 1946 | 1,176.00 | 294.00 | |
| 1947 | 1,317.75 | 329.44 | |
| 1948 | 661.50 | 165.38 | |
| 1955 | 6,036.45 | | $1,509.11 |
| 1956 | 10,607.38 | | 2,651.85 |
| 1957 | 1,381.73 | | 345.43 |
| 1958 | 1,012.50 | | |

In Docket Nos. 80834, 80837, 80844, and 80845, respondent determined that petitioners, Joseph Goldstein, Miriam Goldstein Sommer, Estate of Annie Goldstein, Deceased, Nathan E. Goldstein, Executor, and David I. Goldstein, each are liable for gift tax for 1954 in the amount of $1,640.69, as transferees of Nathan E. Goldstein.

In Docket Nos. 80835, 80836, and 80843, respondent determined that petitioners, Joseph Goldstein, Miriam Goldstein Sommer, and David I. Goldstein, each are liable for gift tax for 1954 in the amount of $402.57, as transferees of Annie Goldstein.

The only issue remaining for decision is whether petitioner Nathan E. Goldstein made a completed gift in 1943 when, as settlor, he made a transfer in trust, or whether his transfer in trust in 1943 constituted an incomplete transfer for purposes of the Federal gift tax, with gifts being completed only in subsequent years upon distribution of principal and income to trust beneficiaries.

This consolidated proceeding was submitted on the pleadings and a stipulation of facts with exhibits attached thereto. The stipulated facts are so found.

At all times material to this proceeding, petitioners were residents of Springfield, Massachusetts. The gift tax returns for all years here

involved were filed with the collector or director of internal revenue for the district of Massachusetts.

Nathan and Annie Goldstein, hereinafter referred to as Nathan and Annie, respectively, were husband and wife, and Joseph Goldstein, David I. Goldstein, E. Ernest Goldstein, and Miriam Goldstein Sommer, hereinafter referred to as Joseph, David, Ernest, and Miriam, respectively, were their children. Annie died on April 4, 1955. Her will was probated in Hampden County, Massachusetts. Nathan was appointed and is the duly acting executor of her estate.

It is stipulated that if any deficiencies in gift tax are determined in these cases for the taxable year 1954, petitioners in Docket Nos. 80834–80837 and 80843–80845 are liable as transferees for said deficiencies, plus statutory interest.

By agreement dated December 30, 1939, Nathan, as trustor, transferred to Springfield Safe Deposit and Trust Company, a banking corporation of Springfield, Massachusetts, and Nathan, as trustees, certain properties to hold in trust. Nathan reserved the right to revoke this trust after January 1, 1943.

By instrument dated January 1, 1943, between the same parties, Nathan amended the trust agreement of December 30, 1939, by substituting an entire new agreement therefor. A summary of the pertinent parts of the trust agreement of January 1, 1943, is as follows:

The agreement was between Nathan, as trustor, and Springfield Safe Deposit and Trust Company and Nathan, as trustees.

Nathan transferred to the trustees and their successors certain properties specified in a schedule attached thereto to have and hold the same in trust and to manage or control the same upon the terms, with the powers, and subject to the conditions expressed in the agreement.

Paragraph First sets forth the powers of the trustees in managing the trust and gives them rather broad powers.

Paragraph Second provides that during the term of the agreement and until its termination, the trustees shall pay out of the net income, in periodical installments as they deem proper, specified amounts annually to the trustor's stepmother, to his wife, to each of his four children, and to each of his two sisters, the specified payments totaling $4,800 per annum. Upon the death of any beneficiary, the payments to him or her are to cease.

Paragraph Second also provides that in the event the net income in any year is insufficient to pay all the specified amounts, the specified payment to Nathan's stepmother shall be paid in full and the remaining income shall be paid to the other beneficiaries, pro rata. Any net income remaining after all payments directed or authorized have been made shall be held by the trustee as accumulated income,

Paragraph Second contains the following provision:

The Trustees shall have the further power in their uncontrolled discretion to pay at different times to the individual beneficiaries named above out of the income of the trust whether current or accumulated and also out of the principal of the trust, such sums as they in their uncontrolled discretion determine it is proper to pay, the amount to be paid to any particular beneficiary shall be determined solely by the Trustees and they shall not be bound to pay either from the principal of the fund, or any income the same amount to each of the beneficiaries but they may pay to any beneficiary any proportion of the fund or the income which they in their uncontrolled discretion may deem wise. * * *

Paragraph Second further provides that when the trustor's youngest surviving child who is now living attains the age of 30 years or upon the expiration of 5 years after the death of the survivor of Nathan and Annie, whichever occurs last, the trustees shall continue to hold in trust $5,000 "which shall be taken from the principal of the trust" for the benefit of Nathan's stepmother, as long as she lives and remains a widow, and after making the deductions provided for shall transfer and deliver all the rest of the principal and all the undistributed income, both accumulated and current, in equal shares to the then living children of Nathan or the issue of a deceased child,

but Nathan E. Goldstein, the Trustor, expressly reserves to himself the right and power at any time during his lifetime by an instrument in writing * * * to change, substitute or eliminate any of the beneficiaries of the principal of the trust fund and the share or shares to be received by them or any of them out of the principal of the trust fund, but this power shall not extend to any income, accumulated or current, and the Trustor shall not designate himself as a beneficiary to receive any part of the principal, and further the Trustor reserves to his wife, Annie Goldstein, the right and power at any time after his death by an instrument in writing * * * to change, substitute, or eliminate the share of any child or of the issue of any child in any part of the principal of the fund but she has not the right to add to the beneficiaries of the principal of the trust fund any person not named above as a beneficiary of the principal of the trust fund.

Paragraph Third provides that the trust shall terminate upon the trustees transferring all of the principal and accumulated income as provided in paragraph Second and also provides that the trust shall not be revocable by the trustor.

Paragraph Fourth provides that the trustor shall have the right at any time to appoint a third trustee and further that any two trustees shall have the right and power to request and receive the resignation of the other trustee. Also any beneficiary may be appointed trustee.

Paragraph Fifth provides that the trustees shall render to the trustor during his lifetime, thereafter to his wife during her lifetime, and then to his children, an accounting of the administration of the

trust property by the trustees each 3 months during the term of the trust.

The Sixth and last paragraph of the trust provides for the manner of resignation of a trustee and also provides for the appointment of a successor trustee by the trustor within 30 days after the resignation of a trustee and for alternative methods of appointing successor trustees in the event the trustor is deceased or does not act.

Nathan filed a gift tax return for the year 1943 which contained the following statement:

Securities, mortgages and cash under amendment dated Jan. 1, 1943 to trust agreement dated Dec. 30, 1939.

| *Date* | *Value* |
|---|---|
| Jan. 1, 1943_____ | $197, 048. 04 |

To Ralph W. Crowell, Vincent B. H. Smith, and Springfield Safe Deposit and Trust Co., Trustees, Springfield, Mass.

Donor retains power to change beneficial interests. It is not believed that this constitutes a completed gift, under Estate of Sanford v. Comm. 308 U.S. 39.

Nathan resigned as trustee on June 28, 1943, and appointed in his place Ralph W. Crowell. Also on June 28, 1943, Nathan appointed Vincent B. H. Smith as the third trustee. On October 25, 1946, Smith resigned and on October 31, 1946, Nathan appointed Ernest as his successor trustee. Ernest resigned on October 27, 1952, and on November 20, 1952, Nathan appointed Joseph as his successor trustee. The present trustees of the trust are Springfield Safe Deposit and Trust Company, Ralph W. Crowell, and the trustor's son, Joseph, who is also one of the beneficiaries of the trust.

During the years 1940 through 1958, the trustees made distributions of income and principal from the trust to the various beneficiaries named in the trust agreement as follows:

| Trust Income: | 1940 | 1941 | 1942 | 1943 | 1944 |
|---|---|---|---|---|---|
| Annie_____ | $7, 500 | $6, 500. 00 | $2, 600 | $3, 200. 00 | $6, 350. 00 |
| Ernest_____ | _____ | 1, 652. 00 | 1, 512 | 600. 00 | 950. 00 |
| Joseph_____ | _____ | 651. 50 | 2, 175 | 2, 247. 29 | 762. 80 |
| David_____ | _____ | 760. 50 | 1, 805 | 1, 498. 18 | 412. 06 |
| Miriam_____ | _____ | 10. 00 | _____ | 25. 00 | 350. 00 |
| Trust Principal: | | | | | |
| Annie_____ | _____ | _____ | _____ | _____ | 15, 450. 00 |

| Trust Income: | 1945 | 1946 | 1947 | 1948 | 1949 |
|---|---|---|---|---|---|
| Annie_____ | $3, 813. 25 | $3, 950. 00 | $6, 200 | $6, 150 | $2, 800. 00 |
| Ernest_____ | 912. 50 | 737. 50 | 600 | 650 | 600. 00 |
| Joseph_____ | 855. 80 | 600. 00 | 1, 400 | 1, 925 | 2, 400. 00 |
| David_____ | 857. 66 | 1, 248. 50 | 1, 022 | 1, 925 | 2, 300. 00 |
| Miriam_____ | 300. 00 | 1, 300. 00 | 600 | 650 | 1, 702. 60 |
| Trust Principal: | | | | | |
| Annie_____ | _____ | _____ | 3, 000 | _____ | _____ |

| Trust Income: | 1950 | 1951 | 1952 | 1953 | 1954 |
|---|---|---|---|---|---|
| Annie | $2,800.00 | $2,800.00 | $2,650.00 | $3,483.00 | $4,800.00 |
| Ernest | 600.00 | 600.00 | 550.00 | 600.00 | 600.00 |
| Joseph | 1,897.80 | 3,551.07 | 2,688.40 | 2,644.80 | 2,381.40 |
| David | 602.71 | 1,890.56 | 1,890.56 | 1,640.56 | 1,359.53 |
| Miriam | 4,700.00 | 1,600.00 | 2,500.00 | 1,850.00 | 1,850.00 |
| Trust Principal: | | | | | |
| Annie | 12,500.00 | --------- | --------- | --------- | --------- |
| Miriam | --------- | --------- | --------- | 1,800.00 | 1,800.00 |
| Ernest | --------- | --------- | --------- | --------- | --------- |

| Trust Income: | 1955 | 1956 | 1957 | 1958 |
|---|---|---|---|---|
| Annie | --------- | --------- | --------- | ------ |
| Ernest | $600.00 | $1,400.00 | $1,200.00 | ------ |
| Joseph | 4,578.70 | 2,764.80 | 1,429.30 | ------ |
| David | 2,328.50 | 3,278.50 | 3,428.50 | ------ |
| Miriam | 4,350.00 | 3,550.00 | 3,700.00 | ------ |
| Trust Principal: | | | | |
| Miriam | 250.00 | --------- | 3,000.00 | $7,500 |
| Ernest | 500.00 | --------- | --------- | ------ |
| Joseph | 12,500.00 | 40,500.00 | --------- | ------ |
| David | 2,000.00 | --------- | --------- | ------ |

It is stipulated and so found that the value of the total gifts made by Nathan in the year 1934 was $14,482.35, of which $9,482.35 is the amount of specific exemption claimed and allocable on account of said year, after an exclusion of $5,000.

It is stipulated and is found that the failure to file gift tax returns on or before the due date on account of the years in question was due to reasonable cause and not due to willful neglect of Nathan.

ULTIMATE FINDINGS.

All distributions of income and principal prior to the year 1943 were completed gifts in the year distributed and are subject to gift tax in those years.

The transfer in trust made by Nathan in 1943 was not a completed gift of principal of the trust for gift tax purposes. Gifts of principal of the trust were completed when the principal was distributed to the beneficiaries and the amounts of principal so distributed are taxable for gift tax purposes in the years distributed.

The transfer in trust made by Nathan in 1943 was a completed gift of the income of the trust in 1943 for gift tax purposes and subsequent distributions of income of the trust are not subject to gift tax.

---

The issue is whether Nathan made a completed gift in 1943 when he amended the trust agreement which originally established the trust in 1939, so that distributions of income and principal of the trust to the beneficiaries subsequent to the amendment were not taxable as gifts, or

whether the transfer in trust in 1943 was incomplete for gift tax purposes so that each distribution of income and principal became a completed gift and subject to gift tax in the years actually distributed to the beneficiaries. There is no claim that the original transfer in 1939 constituted a completed gift of either income or principal and we have accordingly found that all distributions from the trust made prior to 1943 were taxable in the years distributed.

We reach a different conclusion with respect to principal and income under the trust agreement executed in 1943, and will consider them separately herein.

With respect to principal, Nathan expressly reserved in himself the right and power at any time during his lifetime "to change, substitute or eliminate any of the beneficiaries of the principal of the trust fund and the share or shares to be received by them or any of them out of the principal of the trust fund, but this power shall not extend to any income, accumulated or current, and the Trustor shall not designate himself as a beneficiary to receive any part of the principal." Without more, the rule established in *Estate of Sanford* v. *Commissioner*, 308 U.S. 39 (1939), would require the conclusion that the gift of principal was incomplete under the trust agreement as amended in 1943. It was stated in the opinion in that case, "the essence of a transfer is the passage of control over the economic benefits of property rather than any technical changes in its title. * * * retention of control over the disposition of the trust property, whether for the benefit of the donor or others, renders the gift incomplete until the power is relinquished whether in life or at death." That case held that reservation of the right and power to change the beneficiaries of the trust, even though the donor could not name himself, was sufficient to render the gift incomplete until the power was relinquished. We have no problem of relinquishment of the reserved power here, because there was none.

But petitioners argue that Nathan's retained power to change the beneficiaries of the principal of the trust was so circumscribed by limitations as to exclude it from the rule of the *Sanford* case.[2] They argue that Nathan's reserved power was limited to a power exercisable during his lifetime but taking effect only with regard to such principal of the trust as might remain in the hands of the trustees on termination of the trust, and that the effect of any change in beneficiaries made by Nathan might be defeated by an exercise of the trustees' right to distribute the entire trust principal to any of the named beneficiaries prior to the time specified in the trust agreement for distribution of principal, or by the exercise of Annie's right

---

[2] Respondent has not pleaded and does not contend that petitioners are estopped to maintain this position by Nathan's representations with regard to *Estate of Sanford* v. *Commissioner*, 308 U.S. 39 (1939), in his gift tax return for 1943.

to change the beneficiaries of principal after Nathan's death. They contend that these factors so limit Nathan's retained power as to liken it to a remote and contingent power of reversion which would not make the transfer incomplete except as to the value of the reversionary power, citing *Smith* v. *Shaughnessy*, 318 U.S. 176 (1943), and that the value of the reversionary interest is impossible to ascertain so the entire value of the property transferred in trust was taxable as a completed gift in 1943, citing *Robinette* v. *Helvering*, 318 U.S. 184 (1943), *Lockhard* v. *Commissioner*, 166 F. 2d 409 (C.A. 1, 1948), affirming 7 T.C. 1151 (1946), *John A. Griswold, Jr.*, 3 T.C. 909 (1944), *Pauline Wilkens Tidemann*, 1 T.C. 968 (1943), and other cases.

In passing, we have some doubts that petitioners' construction of the trust agreement is correct. It seems doubtful that the trust agreement would be construed to permit the trustees to defeat entirely Nathan's rather detailed scheme of disposition of the trust estate by distributing the entire trust estate to named beneficiaries, possibly even to the exclusion of additional beneficiaries named after 1943 by Nathan, prior to the distribution date specified in the agreement. See *State Street Trust Co.* v. *Crocker*, 306 Mass. 257, 28 N.E. 2d 5 (1940); *Kemp* v. *Paterson*, 4 App. Div. 2d 153, 163 N.Y.S. 2d 245 (1st Dept. 1957), dismissed 4 N.Y. 2d 712, 171 N.Y.S. 2d 102 (1958). And we note that Annie's right to change beneficiaries after Nathan's death was limited to the right to change, substitute, or eliminate the share of any child or issue of any child in any part of the principal with no right to add beneficiaries, whereas Nathan's right was not so limited. It seems probable that Nathan could have added a beneficiary whom Annie could not eliminate. Furthermore, the right of third parties to modify the terms of a trust after the settlor's death, which right the settlor also reserved to himself during his lifetime, was held not to so limit the settlor's reserved power as to make the transfer a completed gift in the second trust considered in *Orrin G. Wood*, 40 B.T.A. 905 (1939).

However, we do not think it is necessary to consider whether petitioners' construction of the trust agreement is correct, because even under their construction we believe Nathan's retained power to change the beneficiaries of principal was sufficient to make the gift of principal incomplete in 1943.

In *Latta* v. *Commissioner*, 212 F. 2d 164 (1954), affirming a Memorandum Opinion of this Court, certiorari denied 348 U.S. 825 (1954), it was held that where the settlor of a trust reserved the right in himself to modify the terms of the trust, but only with the unanimous consent of the trustees, none of whom had a substantial interest in the trust adverse to the settlor's, the gift was not complete until the settlor relinquished his right. In *Higgins* v. *Commissioner*, 129 F.

2d 237 (1942), affirming 44 B.T.A. 1123 (1941), where the settlor's powers to alter beneficial interests in the trust were limited to a rather narrow class, the argument that the reserved power was limited to such a narrow range as not to fall within the *Sanford* rule was rejected. See also *Rasquin* v. *Humphreys*, 308 U.S. 54 (1939) ; *Amelia Solomon*, 43 B.T.A. 234 (1941), affd. 124 F. 2d 86 (C.A. 3, 1941).

On the other hand, in *Robinette* v. *Helvering, supra*, and *Smith* v. *Shaughnessy, supra*, it was held that the settlors' contingent reversionary interests did not make incomplete the gifts of contingent remainders, even though the value thereof might be reduced by the value of the reversionary interests, if ascertainable; in *Olive H. Prouty*, 41 B.T.A. 274 (1940), affirmed in part and reversed in part and remanded 115 F. 2d 331 (C.A. 1, 1940), it was held that a settlor's retained rights of control over property transferred in trust, exercisable only in conjunction with one having an interest in the trust adverse to settlor's interest, was not a retained right to control the property so as to make the gift in trust incomplete; and in *Estate of Louis J. Kolb*, 5 T.C. 588 (1945), where the settlor reserved the right to name afterborn grandchildren as beneficiaries it was held that the settlor had made completed gifts when the trust was established because he could regain dominion and control over the property only on the happening of an event over which he had no control; namely, the birth of a grandchild.

We do not consider the above two lines of cases, dealing directly or indirectly with limitations on the power of the settlor to control interests in property after a transfer in trust, to be in conflict with one another, but rather to establish the following proposition. If the settlor's retained power is presently exercisable, and is not subject to a condition precedent, despite the fact that the effect of its exercise may subsequently be defeated by events beyond his control, and despite the narrow range within which the power may be exercised, then it prevents the divestment of dominion and control required for the consummation of a gift. On the other hand, if the power retained by a settlor becomes exercisable only upon the occurrence of an event over which he had no control, or upon the concurrence of someone having an interest in the trust property adverse to his, such a reserved power does not make a gift by transfer in trust incomplete.

Considered in the light of the above proposition, we find that Nathan's transfer in trust in 1943 was an incomplete gift of the principal of the trust. Nathan retained at all times during his life the unrestricted and unlimited right to change the beneficiaries of the principal and this right could be defeated, if at all, only by an event over which he had no control. Until such event happened, Nathan in his individual capacity retained dominion and control over the principal. Under the rule of the *Sanford* case, the gift of principal was

not completed by the transfer in trust in 1943, but became complete when and as principal was distributed by the trustees in subsequent years and such distributions were subject to gift tax in those years.

But with respect to income, we have more difficulty. It seems clear that for gift tax purposes a completed gift of income can be made even though the gift of the principal which produces the income is not complete. *William T. Walker*, 40 B.T.A. 762 (1939); *Emery May Holden Norweb*, 41 B.T.A. 179 (1940). Cf. *Sensenbrenner* v. *Commissioner*, 134 F. 2d 883 (C.A. 7, 1943), affirming 46 B.T.A. 713 (1942). Here Nathan, as donor, divested himself completely of all dominion and control over the income from the property by the transfer in trust in 1943. The trustees were directed to pay to the named beneficiaries specified sums annually out of income. If the income was not sufficient, the trustees could reduce the payments pro rata to all except Nathan's stepmother; or if the income was in excess of the amount required, the trustees could either distribute it among the "individual beneficiaries named above" or accumulate it in their uncontrolled discretion. Nathan's reserved power to change the beneficiaries was specifically limited to principal, and did not even extend to accumulated income. Except as a possible trustee, which he was not after June 28, 1943, Nathan had no dominion or control whatsoever over the income of the trust. He could not revoke the trust and he could not reacquire any interest in the income of the trust for himself. Even as trustee he could only have controlled the distribution of excess trust income among the beneficiaries named in the trust agreement, and this is true with respect to accumulated income as well as current income.

We are not here concerned with the value of the gift to the donees and we do not believe that the fact that a beneficiary's share of the income might be changed by action of a third party trustee prevents consummation of the gift of income. In *Higgins* v. *Commissioner*, *supra* at 242, it was said:

If a donor, reserving no powers in himself, irrevocably transfers property to third party trustees, for the benefit of named beneficiaries, but vests in the trustees full power to allocate income and principal among the named beneficiaries, no one could doubt that the donor would be subject to a gift tax upon creation of the trust. Yet the individual beneficiaries * * * would be no more assured of getting anything than were the beneficiaries in the case at bar after the donor's powers were relinquished in 1938. This demonstrates that certainty or uncertainty of benefit from the standpoint of the donees is not the test of the incidence of the gift tax.

See also sec. 25.2511-2(a), Gift Tax Regs.

But the question remains: Did Nathan's right as a trustee, or as a possible trustee by reappointment of himself as such, to allocate income and to distribute principal among the beneficiaries during the

term of the trust amount to such retention of dominion and control over the income of the trust as to make the gift of income incomplete in 1943?

We find no gift tax cases directly in point. However, the estate tax cases hold that a trust is taxable in the estate of the settlor under section 811(d)(2) of the 1939 Code,[3] if he retains the power to appoint himself trustee and the powers of the trustee include powers which, if retained by the settlor in the first instance, would render the transfer taxable. *Estate of Paul Loughridge*, 11 T.C. 968 (1948), affirmed on this point 183 F. 2d 294 (C.A. 10, 1950), certiorari denied 340 U.S. 830 (1950), and cases cited therein. This principle would seem equally applicable in determining whether the settlor made a completed gift for gift tax purposes. This is supported to some extent by section 25.2511–2(e), Gift Tax Regs., which provides that a donor is considered as himself having a power if it is exercisable by him in conjunction with any person not having a substantial adverse interest in the disposition of the transferred property or the income therefrom.

While the gift tax law contains no language similar to that appearing in section 811(d)(2) of the 1939 Code, see footnote 3, and in section 2038(a)(1) of the 1954 Code, section 25.2511–2(c) of the Gift Tax Regulations does provide that a gift is incomplete if and to the extent that a reserved power gives the donor the power to change the interests of the beneficiaries as between themselves unless the power is a fiduciary power limited by a fixed or ascertainable standard. Cf. *Leonard A. Yerkes*, 47 B.T.A. 431 (1942). However, we need not pass on the abstract principle of whether a power reserved to the settlor as a possible trustee to change the interests of the beneficiaries as between themselves would serve to make a gift incomplete for gift tax purposes, because we think that under the particular facts of this case whatever power Nathan retained in the trust agreement with respect to income of the trust was not sufficient to make the transfer of the income of the trust incomplete after 1943. As stated in paragraph (b) of the above regulations, in every case of a transfer of property subject to a reserved power, the terms of the particular power and the facts of the particular case must be examined to determine the scope of the retained power.

Here the trust agreement itself placed all of the income of the trust permanently beyond Nathan's recall. He reserved no power to revoke, amend, or modify the directions contained in the agreement with respect to the income of the trust. Those directions called for distributions of specific minimum amounts to the beneficiaries named therein

---

[3] Section 811(d)(2) provides that there shall be included in the gross estate property transferred by decedent, by trust or otherwise, where the enjoyment thereof was subject at date of his death to any change through the exercise of a power, by decedent alone or in conjunction with any other person, to alter, amend, or revoke.

each year if the trust income was sufficient to do so. True, the trustees were given the power in their uncontrolled discretion to pay at different times to any of the named beneficiaries out of the income and principal of the trust such sums as they determined to be proper, without equalization and without limitation by any specific standard. But, as heretofore noted, it is doubtful that the latter provision would permit the trustees to so reduce the principal of the trust that it would not produce sufficient income to meet the annual distributions specified. And even if the agreement were interpreted to permit such, it is very unlikely that the professional trustee appointed by Nathan, the bank, would decide to do so in view of the overall intent of Nathan, apparent from the entire agreement, to make provision for all members of his family.

Nathan was originally one of the trustees, and the bank was the other. While Nathan had the power to appoint a third trustee, he could not force the resignation of any trustee except by vote of the other two trustees. And what actually happened, as determined from the stipulated facts, was that Nathan resigned as trustee in June 1943 and immediately appointed two presumably unrelated parties to serve with the bank as the three trustees provided for in the trust agreement. Thereafter Nathan had no power himself to force the resignation of any trustee and could not have appointed himself trustee unless one of the trustees voluntarily resigned or was forced to resign by someone other than Nathan. Thereafter, Nathan had no dominion or control over the income of the trust even as trustee, and he had no power to appoint himself without the happening of an event over which he had no direct control. While it is true that there were two resignations of trustees between 1943 and 1958, on each occasion Nathan appointed one of his sons as successor trustee. This meant that one of these trustees was a beneficiary of the trust income and presumably would be opposed to allocation of principal and income in any manner that would adversely affect his interests.

It has been said that the theory behind taxing periodic distributions of income to beneficiaries of a trust as a gift in the years of distribution is that the donor is deemed to have received the income himself and then given it to the beneficiaries. We do not think that theory would apply here. In *Camp* v. *Commissioner*, 195 F. 2d 999 (C.A. 1, 1952), reversing in part 15 T.C. 412 (1950), Judge Magruder analyzed the principle recognized by the Supreme Court in *Burnet* v. *Guggenheim*, 288 U.S. 280 (1933), as being that the gift tax was not aimed at every transfer of legal title without consideration, but, in the language of the Supreme Court, was aimed "at transfers of the title that have the quality of a gift, and a gift is not consummate until put beyond recall." In our opinion, Nathan's transfer in trust in 1943 had the quality of a gift and was certainly put beyond the donor's recall at

least when Nathan resigned as trustee in June 1943, if not before. And we do not think that Nathan retained any such dominion and control over the income of the trust after 1943 as to make the gift incomplete under the rule of the *Sanford* case and those that followed it.

We have therefore concluded that the transfer in trust made by Nathan in 1943 was a completed gift of the income of the trust in 1943, taxable in that year, and that distributions of trust income in subsequent years were not subject to gift tax.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*