CHARLES W. WARD AND VIRGINIA P. WARD, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 30068-83.     Filed July 16, 1986.

*Joseph D. Edwards, Olin G. Shivers,* and *Jeffrey M. Dean,* for the petitioners.

*Francis C. Mucciolo*, for the respondent.

SIMPSON, *Judge*: The Commissioner determined deficiencies in the petitioners' Federal gift taxes as follows:

| Petitioner | 12/31/78 | 12/31/79 | 12/31/80 | 3/31/81 |
|---|---|---|---|---|
| Charles W. Ward | $201,802.14 | $99,276.29 | $11,997 | $14,920.34 |
| Virginia P. Ward | - - - | 39,090.00 | 9,882 | 11,271.70 |

The issues for decision are: (1) Whether Charles W. Ward made a gift to his wife, Virginia P. Ward, of 437 shares of stock in J-Seven Ranch, Inc. (J-Seven), in 1978, and if so, the value of such shares; (2) the number of acres of land given to the petitioners' sons and their wives in 1978; (3) the fair market values of gifts of stock in J-Seven made by the petitioners to their sons in 1979, 1980, and 1981; and (4) if the fair market values of such gifts of stock are greater than was reported on the petitioners' gift tax returns, whether agreements executed by the petitioners and their sons at the time of the gifts providing in such event for a reduction of the number of shares given, so as to avoid gift tax liability, are effective for Federal gift tax purposes.

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioners, Charles W. and Virginia P. Ward, husband and wife, maintained their residence in Florida[1] at the time they filed their petition in this case. Mr. and Mrs. Ward each filed Federal gift tax returns for the calendar quarters ending December 31, 1978, December 31, 1979, December 31, 1980, and March 31, 1981, with the Internal Revenue Service Center, Atlanta, Georgia. We shall refer to a calendar quarter by the calendar year of which it is a part.

Mr. and Mrs. Ward were married on September 13, 1939. They have five children: Virginia, Charles, Jr., Mary, William, and John.

---

[1]The parties have stipulated that the petitioners resided in Clewiston, Flordia, the mailing address of J-Seven and the address stated on their gift tax returns. However, other evidence indicates that the petitioners actually resided in Fort Myers, Flordia, at the time they filed their petition.

When they were first married, the petitioners rented a home in Fort Myers, Florida, for $35 per month. Since then, they have always resided in Fort Myers, eventually buying a home sometime after 1944. Fort Myers is located in Lee County.

Mr. Ward, an attorney, was appointed County Judge of Lee County on March 1, 1939, and he remained in that office through at least 1944. The judicial appointment was a full-time position, requiring that Mr. Ward be at the county courthouse from 9 a.m. to 5 p.m. on weekdays and from 9 a.m. to 1 p.m. on Saturdays. Mr. Ward's income from his position as County Judge ranged from about $3,000 to $4,000 per year. Mrs. Ward was unemployed at the time of the petitioners' marriage in September 1939. Sometime after the Japanese attack on Pearl Harbor in December 1941, she went to work for her father. Her father had been awarded a contract to build a railroad from Fort Myers to the Buckingham Gunnery School east of Fort Myers, and he employed Mrs. Ward to prepare his payroll and to perform other bookkeeping tasks. The record does not establish how much her father paid Mrs. Ward, but it was more than was customary for the type of work because Mrs. Ward worked long hours and on weekends when necessary and because he knew that Mr. and Mrs. Ward were in need of the extra income. Mrs. Ward stopped working for her father sometime before the birth of her son Charles, Jr., on February 14, 1944.

At the time of their marriage, the petitioners had no assets other than some cattle owned by Mr. Ward. Mr. Ward was raised on a farm and has always been interested in cattle. Sometime before he married, Mr. Ward purchased 25 head of cattle, which he ran on open range land in Collier County, Florida, together with cattle owned by his brother, David Elmer Ward. In November 1940, Mr. Ward borrowed money from the Lee County Bank in order to buy an additional 200 head of cattle. These 200 head of cattle were kept on ranch land leased from the Florida Land & Timber Co. (FLT) and located in Hendry County, Florida.

On December 21, 1940, Mr. Ward (as Wilson Ward) entered into a contract with FLT for the purchase of the

Hendry County land (the land contract). Under the contract, FLT agreed to sell Mr. Ward:

Sections Nineteen (19), Twenty (20), Twenty-one (21), Twenty-eight (28), Twenty-nine (29), Thirty (30), Thirty-one (31) and Thirty-two (32), Township Forty-six (46) South, Range Thirty-three (33) East, totaling eight (8) sections, all in Hendry County, Florida, subject to existing roads and easements for roads.

The eight sections contained approximately 5,120 acres. Mr. Ward agreed to pay FLT $7,680 (plus interest) for the land, payable in installments of principal as follows:

| Date | Principal payment |
| --- | --- |
| Upon execution of the contract | $2,560 |
| Feb. 24, 1942 | 1,706 |
| Feb. 24, 1943 | 1,707 |
| Feb. 24, 1944 | 1,707 |

The principal balance due was subject to interest at a rate of 5 percent per annum from February 24, 1941, payable on August 24, 1941, and semiannually thereafter, until the principal was fully paid.

The land contract entitled Mr. Ward to possession of the property on February 24, 1941, and thereafter so long as he performed the obligations of the contract. The land contract further provided that:

It is further agreed and understood that the party of the first part [FLT], under date of December 21, 1940, is to execute a deed to Wilson Ward and David Elmer Ward, and, subject to the conditions and reservations hereinbefore stated, deliver such deed promptly to the First National Bank in Fort Myers, Florida, in escrow.

\* \* \* \* \* \* \*

But if all said sums of money, interest and taxes are paid, as aforesaid, promptly at the times aforesaid, and all agreements on the part of the said party of the second part [Wilson Ward] have been complied with, the party of the first part will, on receiving all said money and interest, and upon the surrender of the duplicate of this contract, execute and deliver or cause to be executed and delivered, to said second party, his heirs or assigns, a good and sufficient warranty deed, conveying said premises in fee simple \* \* \*

The land contract provided that David Elmer Ward was to be a grantee in the escrow deed because he was considering joining in the purchase so as to have a place to run his cattle; but shortly thereafter, he purchased land elsewhere

in Hendry County and decided not to join in the purchase from FLT. FLT never placed a deed in escrow.

Mr. Ward consulted his wife before he entered into the land contract with FLT. They agreed that the land ought to be purchased. Mr. Ward paid the $2,560 downpayment on the land. After Mrs. Ward began working in 1942, her wages and those of Mr. Ward were deposited in a joint bank account. Proceeds from the sale of cattle belonging to one or the other or both of them were also deposited into their joint bank account. The petitioners paid the install-ments of principal and interest payments due FLT with money drawn from their joint account. They did not keep a record of the amounts each contributed to the account or to the purchase from FLT.

After the petitioners paid the last installment of principal and interest due FLT, the president of FLT, on March 24, 1944, executed a deed conveying to Wilson Ward (the petitioner, Charles W. Ward) a fee simple interest in the eight sections of land described in the land contract. In such deed, FLT retained all oil, gas, and mineral rights to the land, contrary to the terms of the land contract. On November 24, 1944, the president of FLT executed a corrected deed wherein the provision concerning oil, gas, and mineral rights conformed to the land contract. In both deeds, Mr. Ward was the sole grantee. Mr. Ward had both deeds recorded in the public records of Hendry County.

On October 7, 1942, Marion C. and Helen M. Ryan (the Ryan sisters) conveyed section 33 of Township 46 South, Range 33 East, Hendry County, to Mr. Ward, as sole grantee. Section 33 was adjacent to the eight sections of land purchased from FLT. The deed was prepared at the direction of Mr. Ward and recorded on October 29, 1942. Mr. Ward paid $1,152 for the property, using funds drawn from the petitioners' joint bank account.

The nine sections of land purchased from FLT and the Ryan sisters (the ranch) contained a total of about 5,712 acres, or almost 9 square miles of land. The ranch was situated about 20 miles southwest of Clewiston and about 55 miles southeast of Fort Myers. The land was suitable primarily for cattle ranching. From 1941 until the incorpora-tion of the ranch in 1978, the petitioners have maintained

cattle on the land. Their sons have also run cattle on the ranch.

The petitioners have always felt that they were co-equal owners of the ranch because they both contributed money toward its purchase and because they both worked on the ranch. During the years when the property was being purchased and both Mr. and Mrs. Ward were employed in Fort Myers, they went to the ranch to check on the cattle only on weekends. In subsequent years, Mrs. Ward continued to help with the ranch by cooking for ranch crews, carrying supplies between Fort Myers and the ranch, and occasionally helping with the cattle.

Mr. Ward prepared a deed conveying a one-half interest in the ranch to Mrs. Ward; an executed copy of the deed has not been located, and Mrs. Ward does not recall receiving the deed. The deed was never recorded. An unexecuted copy of the deed, entitled "Special Deed" and dated March 23, 1943, recites, in part, as follows:

WITNESSETH: That the said party of the first part [Charles Wilson Ward], for and in consideration of the sum of One and No/00 ($1.00) dollars and the other considerations hereafter set forth, does hereby convey and transfer to his wife, the said party of the second part [Virginia Powell Ward], her heirs and assigns forever, the title to an undivided One-half (1/2) interest in the following described lands, situate, lying and being in Hendry County, State of Florida, to-wit:

Sections 19, 20, 21, 28, 29, 30, 31; 32 and 33 of Township 46 South, Range 33 East, less easements for road right-of-way.

These lands were purchased by the said party of the first part and the said party of the second part with their joint monies and the deed from Florida Land and Timber Company and the deed from Marion C. Ryan and Helen M. Ryan should have been made and executed to both of said parties.

This deed is given directly from husband to wife for the purpose as shown and not to avoid the collection of any just debt or other obligation of either of the said parties hereto.

The wife, party of the second part, does not execute this deed for the purpose of relinquishing her dower rights in said lands as the interest therein created by this deed is greater than said dower.

The names of the grantor (Charles Wilson Ward), two witnesses, and a notary public are typed in the appropriate places at the bottom of the copy of the unexecuted deed. The deed is obviously old; certain holes in, and marks on

the face of, the deed appear to have been caused by either the decomposition of the paper or water damage.

On October 17, 1978, Mr. and Mrs. Ward joined in giving portions of the ranch to their sons and their wives. Charles, Jr., and his wife, Frenda, received a rectangular parcel of land, measuring 800 feet by 484 feet, located in section 28. Such parcel contained 387,200 square feet, or 8.9 acres, of land. (There are 43,560 square feet in an acre, 640 acres in a section, and 36 sections in a township. Webster's Third New International Dictionary (1981).) William and his wife, Barbara, received a rectangular parcel in section 20, measuring 1,000 feet by 435.6 feet and containing 435,600 square feet, or 10 acres, of land. John, who was unmarried, received land described as follows:

The south one-half (S 1/2) of the northwest quarter (NW 1/4) and the north one-half (N 1/2) of the southeast quarter (SE 1/4) of the northwest quarter (NW 1/4) of the southwest quarter (SW 1/4) of Section 28, Township 46 South, Range 33 East[.]

We have concluded that such description conveyed 10 acres of land to John.

The petitioners intended to give each son 10 acres of land, and the sons thought that they had each received 10 acres; but, through some error of description or calculation, Charles, Jr., actually received only 8.9 acres. Charles, Jr., discovered that he had received only 8.9 acres in 1979, when a property tax bill arrived. Sometime thereafter, he told his father of the mistake. As of the time of trial, nothing had been done to correct the mistake.

In September 1978, the petitioners and their sons formed J-Seven Ranch, Inc., to provide for an orderly transfer of the ranch from the petitioners to their sons and to ensure that the cattle business would continue as a single economic unit after the petitioners' deaths. J-Seven was capitalized in December 1978; Mr. and Mrs. Ward, as co-grantors, deeded the ranch (less the three parcels previously conveyed to their sons and their wives) to the corporation, and each of their sons contributed 400 head of cattle and certain depreciable assets to the corporation. No cash was contributed to J-Seven. The ranch, as deeded to J-Seven, contained 5,683.1 acres, or 1.1 acres more than intended, due to the mistake in the deed to Charles, Jr.

J-Seven had 7,500 authorized shares of stock, of which 1,000 shares were issued and outstanding during the years in issue. When the corporation was formed, shares were issued to the following persons in the listed amounts:

| Name | Shares |
|------|-------:|
| Charles W. Ward | 437 |
| Virginia P. Ward | 437 |
| Charles, Jr | 42 |
| William | 42 |
| John | 42 |

On March 10, 1979, J-Seven and its five stockholders entered into a stock purchase agreement, which recited in pertinent part as follows:

### ARTICLE I
#### Restrictions on Transfers

1. *Restrictions.* No Stockholder shall transfer or pledge all or any portion of his shares of capital stock of the Corporation to any individual, trust, or corporation, for value without the written consent of the other Stockholders, unless the Stockholder desiring to make the transfer (hereinafter referred to as the Transferor) shall have first offered to sell or encumber his shares of stock as hereinafter provided. Further, no Stockholder shall transfer all or any portion of his stock to any individual, trust or corporation without consideration unless he shall have first received the written consent of the other Stockholders.

2. *Offer to Other Stockholders.* The Transferor shall first offer to sell or encumber his stock to the other Stockholders and the Corporation * * *. In the event of a proposed sale, the other Stockholders shall have thirty (30) days in which to acquire pro rata shares of the offered stock as determined by their stock ownership at the time of the offer, on the terms set forth in the notice or for cash at the price designated in Article III determined as of the date of such notice. In the event of a proposed loan, the other Stockholders may lend money in proportion to their respective stock ownership on the proposed terms * * *

3. *Offer to Corporation.* In the event the other Stockholders shall fail to fully exercise their option within the period specified in paragraph 2, the Corporation shall have forty-five (45) days from the date written notice was delivered to it and the other Stockholders in which to exercise its option, (1) in the event of a proposed sale, to purchase any remaining stock on the terms of the proposed sale or for cash at the price designated in Article III or, (2) in the event of a proposed loan, to loan money on the proposed terms * * *

\*      \*      \*      \*      \*      \*      \*

5. *Failure to Exercise Options.* If all the Stockholders and the Corporation fail to fully exercise their options within the prescribed

period, the Transferor may transfer his interest in the stock (or any remaining stock) to the person or persons designated in the offer * * * Any transferee shall take his stock subject to the terms of this Agreement and further transfer of the stock shall be restricted as herein provided. * * *

\* \* \* \* \* \* \*

## ARTICLE II
### Sale and Purchase at Death

1. *Purchase Upon Death.* Upon the death of a Stockholder (hereinafter referred to as the Decedent) all of the shares of the capital stock of the Corporation owned by him and to which he or his personal representative shall be entitled, shall be sold and purchased as herein provided.

2. *Option of Other Stockholders to Purchase.* The other Stockholders shall have six (6) months following the death of the Decedent in which to purchase in pro rata shares * * * the capital stock of the Corporation owned by the Decedent and to which the Decedent or his personal representative shall be entitled at the price set forth in Article III hereof determined as of the date of the Decedent's death. * * *

3. *Obligation of Corporation to Purchase.* The Corporation shall purchase from the Decedent's personal representative and the Decedent's personal representative shall sell to the Corporation all of the shares of the capital stock of the Corporation not purchased by the other Stockholders and which are owned by the Decedent and to which the Decedent or his personal representative shall be entitled, at the price determined as set forth in Article III hereof.

4. *Payment of Purchase Price.* At the closing the purchase price shall be paid by the delivery of a promissory note or notes of the purchaser or purchasers in the amount of the purchaser's share of the purchase price, payable in twenty (20) equal annual installments * * * . The note or notes shall bear interest at the rate of six percent (6%) on the unpaid balance.
\* \* \*

\* \* \* \* \* \* \*

## ARTICLE III
### Purchase Price

1. *Certificate of Value.* The price of the stock of the Corporation shall be determined by using the price per share as fixed in the latest certificate of value executed during the term of this Agreement by all of the Stockholders and the Corporation, provided that such certificate of value shall be dated not earlier than two (2) years prior to the valuation date.*** Simultaneously herewith, the parties hereto have executed a certificate of value, a copy of which is attached to this Agreement.

2. *Untimely Certificate.* In the event that the Stockholders and the Corporation shall have failed to fix a price within two (2) years of the valuation date, then the price of the stock per share shall be agreed upon by the Transferor or the Decedent's personal representative (hereinafter

the "Seller") and the several purchasers, if more than one. In the event that the Seller and one or more purchasers shall be unable to agree upon the price of the stock per share, the price per share shall be fixed by an appraiser * * *

## ARTICLE IV
### *Miscellaneous Provisions*

1. *Corporate Restrictions after Purchase.* So long as any part of the purchase price of the shares of capital stock sold in accordance with this Agreement remains unpaid, the Corporation shall not: declare or pay dividends on its capital stock; reorganize its capital structure (except to reduce its capital as required by the provisions of Article II, Section 5 hereof); issue any additional stock; merge or consolidate with any other corporation; or sell any of its assets except in the regular course of business. * * *

*       *       *       *       *       *       *

8. *Modification.* No change or modification of this Agreement shall be valid unless the same be in writing and signed by all parties hereto.

In accordance with Article III of the stock purchase agreement, the stockholders of J-Seven, on March 10, 1979, executed a certificate of value, which fixed the price of the corporation's stock at $2,000 per share for purposes of the agreement. The stockholders have not executed another certificate of value since that time. There have been no sales of, or attempts to sell, any of the shares of stock of J-Seven through 1984.

On December 28, 1979, each of the petitioners gave to each of their three sons 25 shares of stock in J-Seven. At the time of such gifts, the petitioners and their sons executed an agreement (the gift adjustment agreement) that stated, in pertinent part:

1. *Assignment.* In consideration of love and affection, each Donor does hereby assign to each Donee all of the Donor's right, title and interest in and to twenty-five (25) shares of the capital stock of J-SEVEN RANCH, INC., a Florida corporation, hereinafter called the "Corporation". The parties acknowledge that the computation of the number of shares constituting each gift has been based upon their mutual understanding and belief that the fair market value of each share is $2,000.00, resulting in tax liability for each Donor less than the amount of unified credit against gift tax to which the Donor is entitled at this time under applicable provisions of law.

2. *Future Adjustment.* Each party hereto agrees that if it should be finally determined for Federal gift tax purposes that the fair market value of each share of capital stock of the Corporation exceeds or is less

than $2,000.00 an adjustment will be made in the number of shares constituting each gift so that each Donor will give to each Donee the maximum number of full shares of capital stock of the Corporation, the total value of which will be $50,000.00 from each Donor to each Donee and a total of $150,000 from each Donor to all Donees. Any adjustment so made which results in an increase or decrease in the number of shares held by a stockholder of the Corporation will be made effective as of the same date as this Agreement, and any dividends paid thereafter shall be recomputed and reimbursed as necessary to give effect to the intent of this Agreement.

On December 31, 1980, each petitioner made a gift of 4 shares of stock in J-Seven to each son, and on January 15, 1981, each petitioner made a gift of 5 additional shares to each son. At both times, the petitioners and their sons executed an agreement identical to the gift adjustment agreement of December 1979, with the exception that the acknowledged value of the gifted shares differed: the December 1980 agreement recited a value per share of $2,300 and a value per gift of 4 shares of $9,200; the January 1981 agreement recited a value per share of $2,300 and a value per gift of 5 shares of $11,500.

As of December 31 of each year, the outstanding shares of J-Seven stock were owned as follows:

|                  | 1978 | 1979 | 1980 | 1981 |
|------------------|------|------|------|------|
| Charles W. Ward  | 437  | 362  | 350  | 335  |
| Virginia P. Ward | 437  | 362  | 350  | 335  |
| Charles Jr.      | 42   | 92   | 100  | 110  |
| William          | 42   | 92   | 100  | 110  |
| John             | 42   | 92   | 100  | 110  |

Each share of stock outstanding was entitled to one vote and to dividends when and as declared by the corporation's board of directors. During the years in issue, all five stockholders were directors of the corporation, and the corporate officers were Mr. Ward (president), Mrs. Ward (secretary-treasurer), and Charles, Jr. (vice president).

J-Seven is a "cow and calf" ranch business; the cows owned by the corporation are bred to bulls, and all resulting calves are sold within the year unless retained to replace lost or sold breeding stock. All 1,200 of the cattle contributed to J-Seven upon incorporation were breeding cows, and J-Seven owned 1,200 breeding cows throughout the years in issue. A breeding cow is kept, often for 10 or more years, to

produce calves, whereas a beef cow is raised for slaughter. The breeding cows owned by J-Seven were cross-bred (i.e., not purebred) and of inferior quality, being classified as Florida range or scrub cows. Few cattlemen would purchase such cows for breeding purposes because they prefer more highly bred cows; if sold for slaughter (beef) purposes, such cows would be classed as "canner or low-cutter" grade, rather than as the higher grades (from highest to lowest) of "choice," "good," "commercial," "utility," and "cutter." The J-Seven cows weighed from 600 to 700 pounds each and had a breeding percentage of 50 percent,[2] which was below the Florida average of 85 percent.

During 1979 through 1981, J-Seven was an electing small business corporation for Federal income tax purposes. The corporation reported net income (after depreciation) of $24,507 in 1979, $14,126 in 1980, and $10,723.89 in 1981. In 1980 and 1981, J-Seven paid Charles, Jr., and William $15,000 each as compensation for operating the ranch, and such amounts were deducted in computing the corporation's net profit. In 1981, D & W Farms paid Mr. and Mrs. Ward $9,000 to rent a parcel of the land owned by J-Seven; Mr. and Mrs. Ward reported the rent as income on their individual tax return for 1981, but the corporation did not report such rent as income.

Aside from their ownership of J-Seven, the petitioners and their sons are persons of modest means. From 1976 through 1983, the petitioners' adjusted gross income, as reported on their joint income tax returns, did not exceed $32,110 in any year; and from 1978 through 1983, each son's adjusted gross income, as reported on his income tax return, did not exceed $30,155 in any year.[3]

On their gift tax returns for 1978, each petitioner reported making a gift of an undivided one-half interest in each of the three parcels of land conveyed to their sons and their wives in October 1978. Mr. Ward valued each of his three reported gifts at $2,000, and Mrs. Ward valued each of her three reported gifts at $2,000. Each petitioner signed

---

[2] The "breeding percentage" of a cow refers to the likelihood of its calving in each year. Thus, if a herd of cows has a breeding percentage of 50 percent, then, in each year, 1 calf is born for every 2 cows, or 600 calves for every 1,200 cows.

[3] Charles, Jr., and William each filed a joint Federal income tax return with his wife. John filed as a single individual.

the gift tax return of the other, consenting to have gifts made by either spouse to third parties treated as made one-half by each of them (i.e., electing split-gift treatment). On their gift tax returns for 1979 through 1981, each petitioner reported the gifts to the sons of J-Seven stock as follows:

| Year of gifts | Total shares transferred | Fair market value per share as reported | Total value as reported |
|---|---|---|---|
| 1979 | 75 | $2,000 | $150,000 |
| 1980 | 12 | 2,300 | 27,600 |
| 1981 | 15 | 2,300 | 34,500 |

The Commissioner issued separate notices of deficiency to the petitioners. The Commissioner determined that Mr. Ward made a gift to Mrs. Ward of the 437 shares of J-Seven stock that she received upon the incorporation of the ranch. He valued such gift as follows:

Value of assets transferred to J-Seven:
Land (5,608 acres) value on 12/31/78 ..................... $2,385,000
Depreciable assets ...................................... 132,233
Cattle — 1,200 head at $500 per head.................... 600,000
Total value of 1,000 shares.............................. 3,117,233
Per share value........................... $3,117
×437 shares
Value of gift .......................... $1,362,129

The Commissioner also determined the fair market value of the J-Seven stock and, thus, the total amounts of each petitioner's gifts of stock in 1979 through 1981 to be as follows:

| Year of gifts | Fair market value per share as determined | Total gifts of each petitioner as determined |
|---|---|---|
| 1979 | $3,700 | $277,500 |
| 1980 | 4,275 | 51,300 |
| 1981 | 4,287 | 64,305 |

The Commissioner computed the total value of each petitioner's gifts in the following manner:

| | 12/31/79 | 12/31/80 | 3/31/81 |
|---|---|---|---|
| Value of assets of J-Seven: | | | |
| Land (5,608 acres) | $2,945,000 | $3,505,000 | $3,505,000 |
| Cash | 19,475 | 29,557 | 38,257 |

|  | 12/31/79 | 12/31/80 | 3/31/81 |
|---|---|---|---|
| Depreciable assets | $137,265 | $141,309 | $143,431 |
| Cattle (1,200 head at $500 per head) | 600,000 | 600,000 | 600,000 |
| Total value of 1,000 shares | 3,701,740 | 4,275,866 | 4,286,688 |
| Per-share value | 3,700 | 4,275 | 4,287 |
| Total shares given | ×75 | ×12 | ×15 |
| Total value of gifts | 277,500 | 51,300 | 64,305 |

By amendment of his answer, the Commissioner further determined that: (1) Mr. Ward, alone, made gifts of land to his sons and their wives in 1978; (2) Mr. Ward gave 8.9 acres to Charles, Jr., and his wife, 10 acres to William and his wife, and 85 acres to John; and (3) the per-acre value of such land was $425 at the time of the gifts.

The parties now agree that J-Seven owned the following amounts of cash and that its land and depreciable assets had the following fair market values when the gifts (or alleged gift) of stock were made:

|  | 1978 | 1979 | 1980 | 1981 |
|---|---|---|---|---|
| Land | $425/acre | $500/acre | $525/acre | $525/acre |
| Cash | 0 | 19,475 | 29,557 | 38,257 |
| Depreciable assets | 132,233 | 137,265 | 141,309 | 143,431 |

The parties further agree that J-Seven purchased an unknown quantity of additional land for $12,000 on May 7, 1980.

## OPINION

The first issue for decision is whether Mr. Ward made a gift to his wife of 437 shares of stock in J-Seven when the ranch was contributed to J-Seven, and Mr. and Mrs. Ward each received 437 shares of the corporation in exchange. The resolution of such issue turns on whether Mrs. Ward had an ownership interest in the ranch despite the fact that Mr. Ward, alone, held legal title to the property. The petitioners contend that Mrs. Ward was the beneficial owner of an undivided one-half interest in the ranch by virtue of either a resulting trust, a constructive trust, or a special equity, in her favor.

The ranch was located in Florida, and the law of that State is applicable in determining what interest, if any,

Mrs. Ward may have had in the property. *United States v. National Bank of Commerce*, 472 U.S. 713 (1985); *Morgan v. Commissioner*, 309 U.S. 78 (1940). In making this determination, we are, "in effect, sitting as a state court," being bound by decisions of the Supreme Court of Florida and "giving 'proper regard' to relevant rulings of other courts of the State." *Commissioner v. Estate of Bosch*, 387 U.S. 456, 465 (1967); *Estate of Fulmer v. Commissioner*, 83 T.C. 302, 306 (1984).

Resulting and constructive trusts are implied, as opposed to express, trusts. *Wadlington v. Edwards*, 92 So. 2d 629, 631 (Fla. 1957). A resulting trust arises automatically where property is transferred to one person and the purchase price is paid by another. Under such circumstances, the grantee is presumed to hold title on a resulting trust for the person who furnished the consideration. *Towerhouse Condominium, Inc. v. Millman*, 475 So. 2d 674, 677 (Fla. 1985); *State Dept. of Revenue v. Zuckerman-Vernon Corp.*, 354 So. 2d 353, 356 (Fla. 1977); *Smith v. Smith*, 143 Fla. 159, 196 So. 409, 410 (1940); 5 A. Scott, Trusts 3213, 3309 (3d ed. 1967). A constructive trust is imposed where a person holding title to property would be unjustly enriched if he were permitted to retain it. *Wadlington v. Edwards*, 92 So.2d at 631; *Tillman v. Pitt Cole Co.*, 82 So. 2d 672, 674 (Fla. 1955). The person holding title may be subject to an equitable duty to convey the property to another where the property was acquired "through fraud, duress, undue influence or mistake, or through breach of a fiduciary duty, or through the wrongful disposition of another's property." 5 A. Scott, *supra* at 3215; see *Wadlington v. Edwards*, *supra*; *Tillman v. Pitt Cole Co.*, *supra*; *Socarras v. Yaque*, 452 So. 2d 992, 994 (Fla. Dist. Ct. App. 1984). Whereas a resulting trust arises because the circumstances support the inference that a trust was actually intended, a constructive trust is imposed without regard to the intention of the parties. *Palmland Villas I Condominium Association, Inc. v. Taylor*, 390 So. 2d 123, 125 (Fla. Dist. Ct. App. 1980). Indeed, in a constructive trust, "The element of intent or agreement either oral or written to create the trust relationship is totally lacking." *Wadlington v. Edwards*, 92 So. 2d at 631.

Florida places the burden of proving a resulting trust or a constructive trust on the party who seeks its enforcement, and the proof of either must be "clear and convincing." *King v. King*, 111 So. 2d 33 (Fla. 1959); *Steinhardt v. Steinhardt*, 445 So. 2d 352 (Fla. Dist. Ct. App. 1984); *Hiestand v. Geier*, 396 So. 2d 744 (Fla. Dist. Ct. App. 1981). In the present case, we find that the petitioners have clearly and convincingly[4] established that Mrs. Ward was the beneficial owner of an undivided one-half interest in the ranch by virtue of a resulting trust.

The circumstances surrounding the purchase of the ranch clearly indicate that Mr. and Mrs. Ward intended that Mr. Ward hold legal title to the property for the benefit of them both. At the time they married, the petitioners had no assets other than some cattle owned by Mr. Ward. The ranch was their first real estate purchase. Although Mr. Ward paid the downpayment to FLT, the subsequent installment payments due FLT and the purchase money paid to the Ryan sisters were drawn from the petitioners' joint bank account to which Mrs. Ward made material contributions. She was employed by her father for substantially the entire period during which the installments were due (February 1942 to February 1944), and she deposited her pay to the joint account. It is true that the petitioners kept no record of their respective deposits to the joint account, and it is also true that, 40 years later, Mrs. Ward cannot remember exactly how much money she earned, although she does recall that her father paid her quite well because of the long and unusual hours she worked, their family

---

[4]On brief, the petitioners objected to the imposition of a higher standard of proof than the standard generally applicable in this Court, a preponderance of the evidence. See *Valetti v. Commissioner*, 260 F.2d 185, 187 (3d Cir. 1958), revg. on other grounds 28 T.C. 692 (1957). In an unpublished Memorandum Opinion, we have held that the fact that we look to State law to determine ownership interests in property does not mean that we are to apply the State's test of the sufficiency of the evidence of such ownership interests (*Estate of Levine v. Commissioner*, T.C. Memo. 1968-54); but in other cases, we have looked to State law for the measure of proof required to establish an ownership interest in property, and we have applied the State test even if demanding proof by more than a preponderance of the evidence (see, e.g., *Crane v. Commissioner*, 49 T.C. 85, 92-93 (1967); *Estate of Holt v. Commissioner*, 14 B.T.A. 564, 569 (1928); *Estate of Bloise v. Commissioner*, T.C. Memo. 1966-44; *Estate of Bourland v. Commissioner*, T.C. Memo. 1958-92; cf. *Berger v. United States*, 487 F. Supp. 49, 51 (W.D. Pa. 1980)). We need not decide whether Florida's higher standard of proof *must* be applied in this case (as the Commissioner contends) because we are persuaded that the petitioners have, in fact, met such standard. See *Dodge v. United States*, 413 F.2d 1239, 1242 n.5 (5th Cir. 1969).

relationship, and his knowledge of the petitioners' financial needs. The special deed to Mrs. Ward, prepared by Mr. Ward during the course of the purchase of the ranch, furnishes additional evidence of their intention that the jointly purchased property was owned by them in equal shares.[5] The deed was prepared contemporaneously, and although it may not have been delivered, we have no reason to believe that the failure to do so was due to any disagreement over its provisions.

The Commissioner disputes that the petitioners intended to own the ranch jointly. He argues that Mr. Ward bought the land so that he and his brother, David Elmer Ward, would have a place to run their cattle. The Commissioner points out that the land contract with FLT provided that FLT was to deliver a deed into escrow that named Mr. Ward and David Elmer Ward as co-grantees.

Mr. Ward originally requested that David Elmer Ward be a co-grantee of the escrow deed because his brother then was thinking of joining in the purchase, but his brother was not a party to the land contract. Mr. Ward supplied the downpayment, and only he was contractually obligated to purchase the property. As it turned out, David Elmer Ward purchased other land shortly thereafter, and he never made any contributions toward the purchase from FLT. Instead, Mr. and Mrs. Ward paid the installments due FLT. In light of all the circumstances, these subsequent joint contributions support the inference that Mr. and Mrs. Ward then intended that Mr. Ward take legal title for their mutual benefit upon fulfillment of the contract. In this connection, we observe that a resulting trust arises, if at all, "at the instant the deed is taken and the legal title vests in the grantee"; the alleged beneficiary "must have paid his share of the purchase price, or bound himself to the grantor by an absolute obligation to pay it. No oral agreement, and no payments made after the title is taken, will create a

---

[5]The Commissioner questions the reliability of the special deed because it is dated Mar. 23, 1943, and recites that the deeds from the Ryan sisters and FLT "should have been made and executed to both" Mr. and Mrs. Ward, when, in fact, FLT did not deliver a deed until Mar. 1944. (The Ryan sisters executed their deed in October 1942.) We think the apparent discrepancy is easily explained. The special deed was prepared on the basis of the land contract with FLT, which provided that FLT was to deliver a deed to Mr. Ward as sole grantee upon fulfillment of the contract. (The escrow deed to Mr. Ward and David Elmer Ward, as co-grantees, was never delivered.)

resulting trust." *Womack v. Madison Drug Co.*, 155 Fla. 335, 20 So. 2d 256, 257 (1944); see *Socarras v. Yaque*, 452 So. 2d at 994; *Harnish v. Peele*, 386 So. 2d 8, 10 (Fla. Dist. Ct. App. 1980). Mrs. Ward paid a share of the purchase price before legal title vested in Mr. Ward. Under the doctrine of equitable conversion, he became the equitable, or beneficial, owner of the property immediately upon entering into the land contract with FLT, but his interest in the property did not indefeasibly vest until he paid the last installment due under the contract; only then could he compel FLT to convey legal title. *Henry v. Ecker*, 415 So. 2d 137 (Fla. Dist. Ct. App. 1982); see *Hull v. Maryland Casualty Co.*, 79 So. 2d 517 (Fla. 1954); *Lazer, N.V. v. Hollo*, 432 So. 2d 102 (Fla. Dist. Ct. App. 1983); *B.W.B. Corp. v. Muscare*, 349 So. 2d 183 (Fla. Dist. Ct. App. 1977).

"It is well settled today that a resulting trust may arise when only a part of the purchase price has been paid by one person and title is taken in the name of another." 5 A. Scott, *supra* at 3369. In Florida, payment of part of the consideration carries with it a proportional interest in the property, and the person taking title to the whole becomes the trustee for the other person, pro tanto. *Towerhouse Condominium, Inc. v. Millman*, 475 So. 2d at 677; *Johnson v. Craig*, 158 Fla. 254, 28 So. 2d 696, 698-699 (1947); *Hiestand v. Geier, supra.* However, it is impossible in the present case to determine the part of the consideration for the ranch that Mrs. Ward supplied. The rule in Florida is unclear where a person has made an indeterminate contribution toward the purchase price.

In *Rosenthal v. Largo Land Co.*, 146 Fla. 81, 200 So. 233, 237 (1941), the court stated:

> The law is established to the effect that a person claiming a resulting trust must show that he paid *some specific sum*, for *some distinct interest in, or aliquot part of the said land*: for example, one-half or one-quarter, or other particular fraction of the whole; or for a particular interest as an estate for life or for years or remainder in the whole estate. [Emphasis added.]

Since *Rosenthal v. Largo Land Co.* was decided, the latter requirement that the contributor pay for an aliquot part of the land has been eliminated; the contributor of a determinate sum now takes a proportionate share. *Towerhouse*

*Condominium, Inc. v. Millman, supra; Johnson v. Craig, supra.* But what of the requirement that the contributor have paid "some specific sum"?

> It is often said that a resulting trust does not arise in favor of one who merely makes a "general" or "indefinite" contribution to the purchase price. If A has made contributions from time to time to a fund to which B also contributes, and no account is kept as to the contributions made by each, and the whole fund is used by B in purchasing property, it is held that no resulting trust arises. * * * If there is no evidence as to the amounts contributed it is, of course, impossible to prove what shares the contributors are entitled to. In a few cases the court has cut the knot by holding that where the amounts contributed cannot be ascertained the contributors are entitled to the property in equal shares. At any rate, the indefinite character of A's contributions tends to show that it was not the understanding of the parties that he was to receive any interest in the property purchased. * * * The presumption of a gift or loan arising from the indefinite character of the contributions should be a rebuttable presumption. [5 A. Scott, *supra* at 3374-3376; fn. refs. omitted.]

However, equity may loosen the proof required to establish a resulting trust where the contributors are husband and wife:

> In the case of a purchase of a matrimonial home the usual rules as to a resulting trust are much relaxed. This is especially the case where the spouses are of quite moderate means, and are not likely to make any written or even oral agreement as to the beneficial ownership of the home, and where both have small savings or both are employed, and both contribute to the family support.
>
> It is often a purely accidental circumstance whether money of the husband or of the wife is actually used to pay the purchase price to the vendor, where both are contributing by money or labor to the various expenses of the household. It is often a matter of chance whether the family expenses are incurred and discharged or services are rendered in the maintenance of the home before or after the purchase.
>
> Although many of the cases involve the purchase of the matrimonial home, similar considerations are applicable to the purchase of other land or even to the purchase of personal property during the period of the marriage.
>
> The title may be taken in the name of the husband alone, or in the name of the wife alone, or in their joint names; and the reason for doing so may have nothing to do with the question of who is to have the beneficial interest, a question which later becomes important when one of them dies, or they separate or are divorced.
>
> [5 A. Scott, Trusts 31-32 (Supp. 1985); fn. ref. omitted.]

Were the highest court of Florida now confronted with the question, we are convinced that the court would relax the standards for a resulting trust if the contributors were married. We are persuaded thus by that court's recognition, in similar factual circumstances, of a "special equity" in divorce settlements.

A "special equity" appears to be the functional equivalent of a resulting trust in marriage dissolution cases. A special equity is "a vested interest in property brought into the marriage or acquired during the marriage because of contribution of services or funds over and above normal marital duties." *Canakaris v. Canakaris*, 382 So. 2d 1197, 1200 (Fla. 1980); see *Bosch v. United States*, 590 F.2d 165, 167 (5th Cir. 1979); *Mann v. Commissioner*, 74 T.C. 1249, 1259 (1980). Although the special equity "only comes into actual identifiable form upon the termination of the marriage status" (*Bosch v. United States*, 590 F.2d at 167), it is not alimony (*Canakaris v. Canakaris*, supra; *Duncan v. Duncan*, 379 So. 2d 949, 952 (Fla. 1980); *Heath v. Heath*, 103 Fla. 1071, 138 So. 796 (1932)). The special equity concept developed in case law because Florida's former alimony statute absolutely denied alimony to an adulterous wife. *Heath v. Heath*, supra. A court will award a special equity in separately held property only on proof that the spouse without title has made an "extraordinary contribution toward its acquisition, either financially or through personal industry and service to the other party." *Ball v. Ball*, 335 So. 2d 5, 7 (Fla. 1976); see *Eakin v. Eakin*, 99 So. 2d 854 (Fla. 1958); *Strauss v. Strauss*, 148 Fla. 23, 3 So. 2d 727 (1941). For example, a special equity may arise when a wife's capital or labor nurtures the husband's separately owned business. *Engebretsen v. Engebretsen*, 151 Fla. 372, 11 So. 2d 322 (1942); *Heath v. Heath*, supra; *Beugnet v. Beugnet*, 383 So. 2d 1186 (Fla. Dist. Ct. App. 1980); see *Bosch v. United States*, supra; *Mann v. Commissioner*, supra. Often, if the amount of their respective contributions cannot be definitely established, the wife has been awarded a one-half interest in property held in the husband's name where the wife's services materially assisted the accumulation of the property or the husband acquired the property with funds drawn from a joint bank account to which both

substantially contributed. See, e.g., *Beugnet v. Beugnet, supra*; *Knoblock v. Knoblock*, 351 So. 2d 387 (Fla. Dist. Ct. App. 1977); *Scheidl v. Scheidl*, 343 So. 2d 963 (Fla. Dist. Ct. App. 1977); *Razzano v. Razzano*, 307 So. 2d 894 (Fla. Dist. Ct. App. 1975); *Green v. Green*, 228 So. 2d 112 (Fla. Dist. Ct. App. 1969).

In the case before us, we are convinced that Mr. and Mrs. Ward contributed jointly toward the purchase of the ranch with the intent and understanding that they would own the ranch jointly. That Mrs. Ward cannot now establish the exact amount of her financial contribution does not negate the inference of a resulting trust from the circumstances surrounding the purchase. Accordingly, we hold that Mrs. Ward was the owner of an undivided one-half interest in the ranch before it was conveyed to J-Seven and, therefore, that Mr. Ward made no gift to her when she received 437 shares upon its contribution to J-Seven.

The next issue for decision is the number of acres of land given by the petitioners to their son, John, and to their son, Charles, Jr., and his wife, Frenda, in 1978. The Commissioner maintains that John received 85 acres and that Charles, Jr., and Frenda received 8.9 acres. The Commissioner bears the burden of proof on this issue, having raised it for the first time by amendment of his answer. Rule 142(a), Tax Court Rules of Practice and Procedure.[6] The record clearly establishes that the petitioners intended to give each of their sons (with their wives) a 10-acre parcel of the ranch. On their gift tax returns for 1978, each petitioner reported making a gift of an undivided one-half interest in each of the three described parcels. The one-half interests were valued equally at $2,000, for a total fair market value of $4,000 per 10 acre parcel ($400 per acre).

Reading the description of the land conveyed to John, the Commissioner has come to the understandable, but nonetheless incorrect, conclusion that John received 85 rather than 10 acres of land. The parcel was described as follows:

The south one-half (S 1/2) of the northwest quarter (NW 1/4) and the north one-half (N 1/2) of the southeast quarter (SE 1/4) of the northwest quarter (NW 1/4) of the southwest quarter (SW 1/4) of Section 28, Township 46 South, Range 33 East[.]

---

[6]Any reference to a Rule is to the Tax Court Rules of Practice and Procedure.

As we read such description, all of the statements following "the north one-half (N 1/2) of the southeast quarter (SE 1/4)" pertain to both the "south one-half" and the "north one-half" previously described. Thus, John received the south one-half of the northwest quarter and the north one-half of the southeast quarter, where both such half-quarters are located in the northwest quarter of the southwest quarter of section 28. Since a section contains 640 acres, one-half of a quarter, of a quarter, of a quarter, of a section contains 5 acres, and two such halves contain a total of 10 acres. To find that the parcel described contains 85 acres, one would have to read the description as conveying the south one-half of the northwest quarter of section 28 (or one-half of 160 acres, or 80 acres) plus the north one-half of the southeast quarter of the northwest quarter of the southwest quarter of section 28 (or 5 acres). Such reading would require that commas be inserted so that the description would read:

The south one-half (S 1/2) of the northwest quarter (NW 1/4), and the north one-half (N 1/2) of the southeast quarter (SE 1/4) of the northwest quarter (NW 1/4) of the southwest quarter (SW 1/4), of Section 28, Township 46 South, Range 33 East.

Although there may be some ambiguity in the description as written, its meaning becomes clear when considered in the light of the petitioners' and John's understanding that he was to receive 10 acres.

There was some testimony to the effect that the Hendry County tax assessor's office interpreted the deed to John as conveying 85 acres of land. If so, the assessor's office labors under the same misinterpretation as does the Commissioner, but such mistake does not alter the legal effect of the deed, which was to convey only 10 acres.

We turn now to the gift of land to Charles, Jr., and Frenda: it is indisputable that the parcel described contained 8.9 rather than 10 acres of land. That they received less than 10 acres was due to a mistake either in drafting or calculation. The petitioners ask that we find that they made a gift of 10 acres because, under Florida law, the parties can voluntarily execute a corrected deed or the petitioners could obtain a judicial reformation of the deed. However, "not even judicial reformation can operate to change the

federal tax consequences of a completed transaction." *Van Den Wymelenberg v. United States*, 397 F.2d 443, 445 (7th Cir. 1968); see *Harris v. Commissioner*, 461 F.2d 554, 556 n. 2 (5th Cir. 1972), affg. a Memorandum Opinion of this Court; *Emerson Institute v. United States*, 356 F.2d 824 (D.C. Cir. 1966); *Piel v. Commissioner*, 340 F.2d 887 (2d Cir. 1965), affg. a Memorandum Opinion of this Court; *M.T. Straight's Trust v. Commissioner*, 245 F.2d 327 (8th Cir. 1957), affg. 24 T.C. 69 (1955); *Sinopoulo v. Jones*, 154 F.2d 648 (10th Cir. 1946); contra *Flitcroft v. Commissioner*, 328 F.2d 449 (9th Cir. 1964), revg. 39 T. C. 52 (1962). The petitioners made a completed gift of 8.9 acres in 1978, and until they execute a corrected deed or obtain a judicial reformation, they have not made a completed gift of the additional 1.1 acres that they intended to convey to Charles, Jr., and Frenda. For their part, Charles, Jr., and Frenda have no power to compel the petitioners to convey the additional acreage. Under Florida law, the grantee of a voluntary conveyance, made without any consideration, cannot obtain reformation as against the grantor: "There being no consideration moving the grantor, the volunteer has no claim on him. If there is a mistake or a defect, it is a mere failure in a bounty which, as the grantor was not bound to make, he is not bound to perfect." *Smith v. Pattishall*, 127 Fla. 474, 176 So. 568, 575 (1937), quoting 23 R.C.L. 344, 345; see also *Triesback v. Tyler*, 62 Fla. 580, 56 So. 947 (1911); *Kelly v. Threlkeld*, 193 So. 2d 7 (Fla. Dist. Ct. App. 1966); *Harrod v. Simmons*, 143 So. 2d 717 (Fla. Dist. Ct. App. 1962).

Accordingly, we conclude that the petitioners together made gifts of 10 acres to John, 10 acres to William and his wife, Barbara, and 8.9 acres to Charles, Jr., and Frenda. The parties now agree that the land had a fair market value of $425 per acre in 1978 rather than the $400 per acre reported on the petitioners' gift tax returns.

The third issue for decision is the value of the shares of J-Seven stock given by the petitioners to their sons in 1979, 1980, and 1981. The gift tax is imposed "on the transfer of property by gift." Sec. 2501(a)(1). The gift is measured by the value of the property passing from the donor; if the gift is made in property, the property's value at the date of the

gift is considered the amount of the gift. Sec. 2512(a); secs. 25.2511-2(a) and 25.2512-1, Gift Tax Regs. Section 25.2512-1 of the regulations states that "The value of the property is the price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of relevant facts."

In determining the value of unlisted stocks, actual arm's-length sales of such stock in the normal course of business within a reasonable time before or after the valuation date are the best criteria of market value. *Duncan Industries, Inc. v. Commissioner*, 73 T.C. 266, 276 (1979). However, the stock of J-Seven has never been publicly traded, and there have never been any sales of the stock. In the absence of arm's-length sales, the value of the stock is to be determined by taking into consideration the company's net worth, prospective earning power and dividend-paying capacity, and other relevant factors. Sec. 25.2512-2(f), Gift Tax Regs.; *Estate of Andrews v. Commissioner*, 79 T.C. 938, 940 (1982). Such "other relevant factors" include:

the good will of the business; the economic outlook in the particular industry; the company's position in the industry and its management; the degree of the control of the business represented by the block of stock to be valued; and the values of securities of corporations engaged in the same or similar lines of business which are listed on a stock exchange. However, the weight to be accorded such comparisons or any other evidentiary factors considered in the determination of a value depends upon the facts of each case. [Sec. 25.2512-2(f), Gift Tax Regs.]

The petitioners contend that the valuation of the J-Seven stock should be based, in part, on the liquidation value of the corporation's assets and the value placed on the shares in the stockholders' stock purchase agreement, but that greater weight should be given the corporation's earnings and dividend-paying capacity. The Commissioner maintains that the stock valuation should be based solely on the value of the corporation's assets, without any reduction for liquidation costs (i.e., real estate sales commissions and income taxes due on the sale) and without any discounts for lack of control or lack of marketability.

Both parties' expert witnesses valued the stock of J-Seven by reference to the value of the corporation's

underlying assets alone. Both experts reviewed the corporation's income tax returns and, based on the information contained therein, concluded that the stock could not be valued properly using an income capitalization method because the corporation's return on its admittedly valuable assets was exceedingly low. In the words of the petitioners' expert, an income capitalization approach would place a "ridiculous[ly] low" value on the stock. The experts agreed that the corporation's value lay in its assets, not in its earning power as an operating ranch.

Where there is an ongoing business such as we have in this case, courts generally have refused to treat either asset value or earnings power as the *sole* criterion in determining stock value. See *Hamm v. Commissioner*, 325 F.2d 934, 941 (8th Cir. 1963), affg. a Memorandum Opinion of this Court; *Estate of Andrews v. Commissioner*, 79 T.C. at 945; *Portland Manufacturing Co. v. Commissioner*, 56 T.C. 58, 80 (1971), affd. without published opinion (9th Cir., April 21, 1975); *Trianon Hotel Co. v. Commissioner*, 30 T.C. 156, 181 (1958); *Hooper v. Commissioner*, 41 B.T.A. 114, 129 (1940). In the cases in which stock was valued solely on the basis of asset value, the corporations were, in essence, in the business of selling their assets, and thus, earnings were not a reliable indicator of value. *Harwood v. Commissioner*, 82 T.C. 239 (1984), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986) (timber business); *Estate of Huntington v. Commissioner*, 36 B.T.A. 698 (1937) (real estate subdivision and sales). However, the degree to which the corporation is actively engaged in producing income rather than merely holding property for investment should influence the weight to be given to earnings power as opposed to net asset value. *Estate of Andrews v. Commissioner*, 79 T.C. at 945.

The petitioners and their sons were actively involved in the ranching business long before J-Seven was incorporated. Neither they nor the corporation has engaged in the business of selling the ranch's underlying assets. In fact, the corporation was formed because the petitioners wanted to pass the cattle business on to their sons, intact. There is no evidence that the corporation intended to liquidate, and there was no power to liquidate attendant to the minority

interests given to the sons during the years in issue. Under these circumstances, the earnings power of the corporation is a factor to be considered in valuing the stock given to the sons. However, in light of the tremendous disparity between the corporation's value as an operating company and its value as an investment holding company, we think such factor is adequately taken into account by reducing the stock's value, as determined under a net asset value method, by a minority discount. A minority discount reflects the minority shareholder's inability to compel a liquidation and, thus, to receive a pro rata share of the corporation's net asset value. *Harwood v. Commissioner*, 82 T.C. at 267.

The only corporate assets the value of which are in dispute are the 1,200 breeding cows owned by the corporation on the date of each gift of stock. The Commissioner determined that each cow had a value of $500 on the date of each gift. He argues that the cows must be valued at the price they would fetch if sold for breeding purposes. The cows were mixed-breed, low-quality, Florida range cattle. We are persuaded that such cows, while usable for breeding, could not be sold for such purpose because of their inferior quality. Charles, Jr., testified that the sales prices reported in the "Florida Livestock Market Report" (published weekly by the Florida Department of Agricultural and Consumer Services) for slaughter cows rated "canner and low-cutter" were consistent with, if not a little higher than, the amount J-Seven received when it sold its breeding cows. According to the "Florida Livestock Market Report," cows of such quality sold for 35 to 44 cents per pound in mid-December 1979, 30 to 38 cents per pound in early December 1980, and 30 to 37 cents per pound in mid-January 1981. Based on an average weight of 650 pounds per cow, we find that the 1,200 J-Seven cows had a fair market value of $260 each in December 1979 and $221 each in December 1980 and January 1981.

The petitioners contend that, in arriving at the corporation's net asset value, adjustments should be made to reflect costs that would be incurred if its assets were liquidated. They seek adjustments for the expenses of selling the real estate (including sales commission) and the

income taxes that would be recognized by the corporation or its shareholders upon liquidation. We disagree with this argument. J-Seven is not in the business of selling its assets piecemeal, and as the petitioners themselves have argued, there is no evidence that the liquidation of the entire corporation is imminent or even contemplated. Under such circumstances, "We need not assume that conversion into cash is the only use available to an owner, for property which we know would cost him market value to replace." *Estate of Cruikshank v. Commissioner*, 9 T.C. 162, 165 (1947). A hypothetical willing buyer of the shares in an arm's-length sale could expect no reduction in price for sales expenses and taxes that he might incur in a subsequent sale of either the shares or the corporation's underlying assets. When liquidation is only speculative, such costs are not to be taken into account. *Estate of Andrews v. Commissioner*, 79 T.C. at 942; *Estate of Piper v. Commissioner*, 72 T. C. 1062, 1086-1087 (1979); *Estate of Cruikshank v. Commissioner, supra.*[7]

Since the parties now agree on the fair market value of the land, the cash, and the depreciable assets owned by J-Seven, and since we have now found the values of the cows, we find that J-Seven had a net asset value (the corporation had no liabilities) and a net asset value per share on the dates of the gifts, as follows:

| Date of gift | Net asset value | Net asset value per share |
|---|---|---|
| Dec. 28, 1979 | $3,310,290 | $3,310 |
| Dec. 31, 1980 | 3,431,693 | 3,432 |
| Jan. 15, 1981 | 3,442,515 | 3,443 |

However, this finding does not end the matter because we must still determine whether the stock purchase agreement affected the value of the shares and what, if any, discounts for lack of control and lack of marketability are applicable.

The petitioners urge that the fair market value of the J-Seven stock was depressed by the existence of the stock

---

[7]The petitioners rely on *Estate of Dooly v. Commissioner*, T.C. Memo. 1972-164, wherein we stated: "The value ultimately selected by him [the taxpayers' stock valuation expert] was somewhat higher than the figures resulting from the earnings and dividend approaches and somewhat lower than that based upon asset value, and much of the reduction from asset value is properly accountable by the appropriate discounts for a minority interest and for liquidation." However, there is no indication that the Commissioner challenged the propriety of the allowance for liquidation costs in that case.

purchase agreement. They do not maintain that the value of the stock was limited to $2,000 a share, the price set forth in the certificate of value executed on March 10, 1979, and they offer no evidence to demonstrate how much the value of the stock was affected by the stock purchase agreement. The Commissioner argues that the fair market value of the stock was not reduced at all by the stock purchase agreement.

A stockholder agreement granting fellow stockholders and the corporation a right of first refusal in any lifetime sale of shares and requiring that the corporation repurchase the shares at death, at a price fixed in the agreement, is not determinative of the fair market value of the shares for gift tax purposes. *Spitzer v. Commissioner*, 153 F.2d 967 (8th Cir. 1946), affg. a Memorandum Opinion of this Court; *Berzon v. Commissioner*, 63 T.C. 601 (1975), affd. 534 F.2d 528 (2d Cir. 1976); *James v. Commissioner*, 3 T.C. 1260 (1944), affd. 148 F.2d 236 (2d Cir. 1945). Such an agreement is, at most, a factor to be considered with all other relevant factors in determining value. *Estate of Reynolds v. Commissioner*, 55 T.C. 172 (1970).

Upon examination of the terms of the J-Seven stock purchase agreement, we hold that its restrictions depressed the value of the shares only minimally. The restrictions had little, if any, effect on the value of the shares because the price fixed in the certificate of value was effective for only 2 years. Thereafter, the parties would have to agree to a new price or have the stock independently appraised, either of which would likely result in a price approximating the stock's current fair market value. Although the price was fixed at $2,000 when the petitioners made the gifts of shares to their sons, there was no indication that the sons intended to sell the shares before the $2,000 price lapsed in March 1981. Moreover, even at the times of the gifts, the stock might have been sold for more than $2,000 a share if the other stockholders and the corporation were unable to purchase stock offered to them under the stock purchase agreement. However, because the stock could not be given away without the written consent of the other stockholders, and because the shares would remain subject to the restrictions in the hands of any donee or purchaser, the

value of the stock was depressed to some small extent, and accordingly, some allowance will be made for such effect.

The shares given by the petitioners to each of their sons represented minority interests in the corporation. Relying on the testimony and report of their expert, the petitioners contend that the value of the shares must be discounted by 33⅓ percent to reflect lack of control over the corporation (a minority discount) and lack of marketability. The Commissioner contends that no minority discount or lack of marketability discount is warranted where family members control a corportion, as in the present case. He argues that the shares represented an interest in pooled " 'family assets,' rather than an interest in a viable corporation where control and marketability are key elements. Further, under these circumstances, the possibility of transfer of the business to nonfamily members was extremely remote. There was clearly a ready market for an individual's shares either in the corporation or in the shareholders."

The courts have long recognized that the shares of stock of a corporation which represent a minority interest are usually worth less than a proportionate share of the value of the assets of the corporation. *Estate of Bright v. United States*, 658 F.2d 999 (5th Cir. 1981) (en banc); *Harwood v. Commissioner, supra*; *Estate of Andrews v. Commissioner, supra*; *Estate of Zaiger v. Commissioner*, 64 T.C. 927 (1975); *Estate of deGuebriant v. Commissioner*, 14 T.C. 611 (1950), revd. on other grounds sub nom. *Claflin v. Commissioner*, 186 F.2d 307 (2d Cir. 1951); *Hooper v. Commissioner, supra*; *Sundquist v. United States*, an unreported case (E.D. Wash. 1974, 34 AFTR 2d 74-6337, 74-2 USTC par. 13,035); *Obermer v. United States*, 238 F. Supp. 29 (D. Hawaii 1964); *Drybrough v. United States*, 208 F. Supp. 279 (W.D. Ky. 1962). The minority discount is recognized because the holder of a minority interest lacks control over corporate policy, cannot direct the payment of dividends, and cannot compel a liquidation of corporate assets. See *Harwood v. Commissioner*, 82 T.C. at 267; *Estate of Andrews v. Commissioner*, 79 T.C. at 953; *Drybrough v. United States*, 208 F. Supp. at 287-288.[8] A lack of marketability discount,

---

[8]*Carr v. Commissioner*, T.C. Memo. 1985-19; *Estate of Kirkpatrick v. Commissioner*, T.C. Memo. 1975-344.

on the other hand, reflects the fact that there is no ready market for shares in a closely held corporation. *Estate of Andrews v. Commissioner*, 79 T.C. at 953.

In *Estate of Bright v. United States, supra*, the Fifth Circuit, sitting en banc, rejected the Government's argument that shares being valued should be combined with other shares owned by the taxpayer's spouse or family in determining whether a control premium or minority discount is warranted. *Estate of Bright* involved the value for estate tax purposes of the decedent's interest in community property, a 55-percent stock interest in three closely held corporations. The decedent's interest was devised to a trust, over which her husband was trustee, for the primary benefit of her children. The Government contended that because the interest to be valued was an undivided one-half interest in the full 55-percent control block, the proper method of valuing such interest would be to value the whole, including its control premium, and then take one-half thereof as the value of the estate's interest. The Fifth Circuit rejected the Government's approach on the ground that the community property was subject to partition and that, consequently, the estate's interest was equivalent to a 27½ percent block of stock. The court refused to attribute any control premium to the estate's interest, even though the decedent's husband, as owner of a 27½ percent block and as trustee of the estate's 27½ percent block, effectively held the estate's shares as part of a controlling block. The Fifth Circuit reasoned first, that case law did not support any type of "family attribution" in which control of the corporation was attributed among family members, and second, that the valuation concept of a hypothetical willing buyer and a hypothetical willing seller made it improper to view the seller and buyer of a hypothetical sale of the stock as members of the controlling family. 658 F.2d at 1002-1006; accord *Propstra v. United States*, 680 F.2d 1248 (9th Cir. 1982); *Estate of Lee v. Commissioner*, 69 T.C. 860 (1978).

We endorsed and relied on the reasoning of *Estate of Bright* in *Estate of Andrews v. Commissioner, supra*, where we held that in valuing the decedent's approximately 20-percent interest in the stock of four corporations, discounts for lack of control and marketability were applicable,

even though the decedent and his siblings owned all the stock in the corporations. We concluded that "For purposes of valuation, one should construct a hypothetical sale from a hypothetical willing seller to a similarly hypothetical willing buyer," regardless of the fact that "the reality of the situation may be that the stock will most probably be sold to a particular party or type of person." 79 T.C. at 955-956.

Although *Estate of Bright* and *Estate of Andrews* involved the valuation of stock for estate tax purposes, the principles relied on in those cases are equally applicable to the valuation of stock for gift tax purposes. Like the estate tax, the gift tax is imposed upon the act of transfer and is measured by the value of the property *passing* from the donor, and not on the value of the property in the hands of a particular recipient. The gift tax regulations, like the estate tax regulations, rely on the concept of the hypothetical willing seller and willing buyer to determine the value of the property transferred. Sec. 25.2512-1, Gift Tax Regs.

In *Estate of Andrews*, we did remark that "the hypothetical sale should not be construed in a vacuum isolated from the actual facts that affect the value of the stock in the hands of the decedent" (79 T.C. at 956), but as in that case, we do not see any facts here that persuade us to value the J-Seven shares given to the petitioners' sons as anything other than minority interests. The parties' experts agreed that there would be little or no market for a minority interest in J-Seven outside the family; but unlike the case of *Luce v. United States*, 4 Cl. Ct. 212 (1983), relied on by the Commissioner, here there is also no established market for the stock in the existing stockholders or the corporation. In *Luce*, the Claims Court held that no minority discount was warranted in valuing gifted shares in a closely held corporation where there was a well-established market for the shares in its controlling stockholders, its managerial employees, and the corporation itself. The court stated that "the applicable market in which the hypothetical willing buyer may be found need not be one which includes the general public. It is sufficient if there are potential buyers among those closely connected with the corporation." 4 Cl. Ct. at 220-221. Since there was an eager, ready market for

the shares in the company or among persons associated with the company, no discount would be needed in order for the hypothetical seller to find a willing buyer. 4 Cl. Ct. at 222. Such is not the case here. The controlling stockholders and J-Seven itself have no history of purchasing the shares of departing stockholders. After making the gifts, the petitioners continued to control the corporation, and it is highly unlikely that either of them would buy back the minority interests that they had given away as part of their estate plan. Likewise, the evidence does not indicate that the sons themselves would be willing or financially able to buy such shares if they were offered at a price even approaching their net asset value. We therefore conclude that discounts for lack of control and marketability are necessary in valuing the shares given by the petitioners in 1979 through 1981.

The petitioners' expert applied a minority discount of $33\frac{1}{3}$ percent; he chose $33\frac{1}{3}$ percent because that was the average minority discount allowed by various courts in recent years. Taking into account the low earnings power of the corporation, the restrictions imposed by the stock purchase agreement, and the limited marketability of the stock, we are convinced that the expert's discount is altogether justified. Consequently, we find and hold that the fair market value of the stock given by the petitioners to their sons was as follows:

| Year of gifts | Fair market value per share |
|---|---|
| 1979 | $2,207 |
| 1980 | 2,288 |
| 1981 | 2,295 |

The final issue for decision is whether the gift adjustment agreement executed on December 28, 1979, is effective to avoid the gift taxes otherwise due in 1979, 1980, and 1981.[9] The petitioners contend that the gift adjustment agreement reflects their intent to give each son a certain "value of

[9] Since we have determined that the petitioners undervalued the stock on their 1979 gift tax returns, they underpaid their gift tax in 1979 and, due to the consequent reduction in the available unified credit, in 1980 and 1981, even though they overvalued the stock on their 1980 and 1981 returns. The petitioners and their sons executed a gift adjustment agreement at the time of each gift of stock in 1979, 1980, and 1981. However, we need only decide whether the 1979 agreement is effective because its effectiveness (or lack thereof) determines whether the petitioners underpaid their gift taxes in subsequent years as well.

property" ($50,000), rather than a specific number of shares (25 shares), and that the number of shares reported on their gift tax returns was merely "representative of the value" which they intended to give. They argue that the gift adjustment agreement is similar to the price adjustment agreement upheld in *King v. United States*, 545 F.2d 700 (10th Cir. 1976), in that both were means of overcoming the uncertainty in ascertaining the fair market value of the stock conveyed. The Commissioner, on the other hand, contends that each petitioner made a completed gift of 25 shares, not $50,000, to each son, and relying on *Commissioner v. Procter*, 142 F.2d 824 (4th Cir. 1944), revg. on other grounds a Memorandum Opinion of this Court, he argues that the gift adjustment is a condition subsequent and void as contrary to public policy.

The gift tax is imposed only when the transfer of property is complete. The regulations provide:

As to any property, or part thereof or interest therein, of which the donor has so parted with dominion and control as to leave in him no power to change its disposition, whether for his own benefit or for the benefit of another, the gift is complete. But if upon a transfer of property (whether in trust or otherwise) the donor reserves any power over its disposition, the gift may be wholly incomplete, or may be partially complete and partially incomplete, depending on all the facts in the particular case. [Sec. 25.2511-2 (b), Gift Tax Regs.]

See *Smith v. Shaughnessy*, 318 U.S. 176 (1943); *Estate of Sanford v. Commissioner*, 308 U.S. 39 (1939); *Burnet v. Guggenheim*, 288 U.S. 280 (1933).

Under the gift adjustment agreement, the petitioners each conveyed 25 shares of J-Seven stock to each son but reserved the power to revoke a part of each gift if it is "finally determined for Federal gift tax purposes" that the fair market value of each share exceeds $2,000.[10] At the time the gifts were made, the petitioners did not possess a presently exercisable right to revoke the gifts in whole or in part. Their power to revoke is contingent upon something over which they have no control. The language of the contingency is ambiguous: it may refer to a determination

---

[10] The gift adjustment agreement did provide for an upward adjustment in the number of shares gifted if it were finally determined for gift tax purposes that the fair market value of each share was less than $2,000; but we think the donees could not enforce the agreement against the donors because it was unsupported by any consideration flowing from the donees.

by the Commissioner, a decision of this Court, a District Court, or the Claims Court, or the outcome on appeal. But, in any event, the power to revest is dependent upon the actions and decisions of third parties. In fact, at the time of the gifts, there was no assurance that the contingency would ever come about because there was no guarantee that the Commissioner would choose to examine the petitioners' gift tax returns.

Although the rule has been attacked on theoretical grounds,[11] it is settled that if the power retained by the donor is exercisable only upon the occurrence of an event over which he has no control, or only with the concurrence of someone having an interest in the property adverse to his, the reserved power does not amount to dominion and control over the property, and there is a completed gift. *Smith v. Shaughnessy, supra; Robinette v. Helvering*, 318 U.S. 184 (1943); *Estate of Goelet v. Commissioner*, 51 T.C. 352, 360 (1968); *Goldstein v. Commissioner*, 37 T.C. 897, 905 (1962); *Estate of Kolb v. Commissioner*, 5 T.C. 588, 593 (1945); *Mack v. Commissioner*, 39 B.T.A. 220, 229 (1939); C. Lowndes, R. Kramer & J. McCord, Federal Estate and Gift Taxes, sec. 28.11 at 719 (3d ed. 1974). The existence of a contingent power to revoke is treated as reducing the value of the gift to the extent of the value of the reserved power (*Smith v. Shaughnessy, supra*); but if the donor retains an interest in the property that "is not susceptible of measurement on the basis of generally accepted valuation principles, the gift tax is applicable to the entire value of the property subject to the gift." Sec. 25.2511-1(e), Gift Tax Regs.; see *Robinette v. Helvering, supra.* In the present case, because of the nature of the gift adjustment contingency, the application of these valuation principles creates an apparent paradox: *On the date of the gifts*, the petitioners' retained

---

[11] See Macris, "Open Valuation and the Completed Transfer: A Problem Area in Federal Gift Taxation," 34 Tax L. Rev. 273 (1979). Mr. Macris contends that, from a theoretical standpoint, a power to revoke that is subject to a contingency beyond the control of the transferor, and that, consequently, the transfer is incomplete as to the property subject to revocation, "even where the occurrence of the external contingency is virtually impossible." 34 Tax L. Rev. 277. However, Mr. Macris acknowledges that the law currently treats such transfers as complete, and he admits that, at least in cases where the contingency is unlikely to occur, "practically speaking, it may be that substance should prevail over form. The unlikelihood of the occurrence of the contingent event can be seen to eviscerate the donor's power, rendering the transfer complete, thus preventing a deferral of tax on a transfer that is, in substance, irrevocable." 34 Tax L. Rev. 278; fn. refs. omitted.

interests in the stock were not susceptible of valuation because contingent upon the actions of third parties, whose choices and determinations were impossible to predict; however, when this Court determines the value of the stock *as of the date of the gifts*, the values of the petitioners' retained interests are necessarily determined.

In *Commissioner v. Procter, supra*, the Fourth Circuit found a similar gift adjustment clause to be a condition subsequent and void because contrary to public policy. 142 F.2d at 827. The Commissioner takes the same position (Rev. Rul. 86-41, 1986-12 I.R.B. 9; Rev. Rul. 65-144, 1965-1 C.B. 442). In *Procter*, the taxpayer made a gift in trust. The trust agreement contained the following clause:

Eleventh: The settlor is advised by counsel and satisfied that the present transfer is not subject to Federal gift tax. However, in the event it should be determined by final judgment or order of a competent federal court of last resort that any part of the transfer in trust hereunder is subject to gift tax, it is agreed by all the parties hereto that in that event the excess property hereby transferred which is decreed by such court to be subject to gift tax, shall automatically be deemed not to be included in the conveyance in trust hereunder and shall remain the sole property of Frederic W. Procter free from the trust hereby created. [142 F.2d at 827.]

The taxpayer contended that, under this clause, the gift did not become effective to the extent it would give rise to a gift tax.

The Fourth Circuit rejected the taxpayer's argument:

We do not think that the gift tax can be avoided by any such device as this. Taxpayer has made a present gift of a future interest in property. He attempts to provide that, if a federal court of last resort shall hold the gift subject to gift tax, it shall be void as to such part of the property given as is subject to the tax. This is clearly a condition subsequent and void because contrary to public policy. A contrary holding would mean that upon a decision that the gift was subject to tax, the court making such decision must hold it not a gift and therefore not subject to tax. Such holding, however, being made in a tax suit to which the donees of the property are not parties, would not be binding upon them and they might later enforce the gift notwithstanding the decision of the Tax Court. It is manifest that a condition which involves this sort of trifling with the judicial process cannot be sustained. [142 F.2d at 827.]

The court found the condition contrary to public policy for three reasons: (1) "it has a tendency to discourage the collection of the tax by the public officials charged with its collection, since the only effect of an attempt to enforce the tax would be to defeat the gift," (2) "the effect of the condition would be to obstruct the administration of justice by requiring the courts to pass upon a moot case," and (3) the condition is to the effect that the final judgment of a court would be neutralized because of the trust provision necessarily before the court when the judgment is rendered; that is, the condition is not to become operative until there has been a judgment that the donor is liable for the tax, but after the judgment has been rendered, it cannot become operative because the matter involved is concluded and rendered moot by the judgment. 142 F.2d at 827-828.

The third reason is inapplicable here if the term "finally determined" in the gift adjustment agreement is meant to apply before there is a final decision of a court, but in any event, the first two reasons are applicable here and are highly persuasive. If a condition like that involved here is given effect for gift tax purposes, there is no incentive for the Commissioner to challenge the donor's valuation of the property transferred because no gift tax deficiency can result, and the Commissioner has no power to compel the donor to reclaim a portion of the property. It has been suggested that the argument that such "savings clauses" frustrate the enforcement of the gift tax is no longer valid under the unified estate and gift transfer tax system. See C. Strobel & G. Strobel II, "Savings Clauses Can Protect Against Revalued Transfers in Family Transactions," 14 Taxation for Lawyers 22, 24 (1985). When *Procter* was decided, the Federal gift and estate taxes were separate taxes, each with its own rate schedule. If the donor could not recover the excess gift or if his right to revoke lapsed before his death, the excess gift would escape both gift and estate taxation. Now, transfers during life and at death are subject to a single unified rate schedule, and the rates are progressive on the basis of cumulative lifetime and deathtime transfers. It appears that in calculating the estate tax, incorrectly valued gifts may be revalued in determining "adjusted taxable gifts" for purposes of section

2001(b),[12] and when such gifts are cumulated with the taxable estate, any upward adjustment in the value of the gifts would result in an increase in estate tax liability. However, we are not persuaded that the mere possibility of estate taxation is sufficient. If, at death, the Commissioner fails to challenge the gift's valuation, the excess value of the gift will pass from the donor's estate without ever being subject to the transfer tax, and in every case, the payment of the tax due on the excess gift is deferred.

Furthermore, a condition that causes a part of a gift to lapse if it is determined for Federal gift tax purposes that the value of the gift exceeds a given amount, so as to avoid a gift tax deficiency, involves the same sort of "trifling with the judicial process" condemned in *Procter*. If valid, such condition would compel us to issue, in effect, a declaratory judgment as to the stock's value, while rendering the case moot as a consequence. Yet, there is no assurance that the petitioners will actually reclaim a portion of the stock previously conveyed to their sons, and our decision on the question of valuation in a gift tax suit is not binding upon the sons, who are not parties to this action. The sons may yet enforce the gifts.

*King v. United States, supra,* relied on by the petitioners, is clearly distinguishable. In that case, the taxpayer created trusts for the benefit of his four children and appointed his lawyer trustee. The taxpayer then sold stock in his closely held corporation to the trusts in an arm's-length transaction, free from any donative intent. The trusts executed notes for $2 million based on a price of $1.25 per share, and

---

[12] The estate tax imposed by sec. 2001(a) is equal to the excess (if any) of the tentative tax (computed in accordance with the rate schedule set forth in sec. 2001(c)) on the sum of the taxable estate and adjusted taxable gifts, over the aggregate amount of gift tax payable with respect to gifts made by the decedent after Dec. 31, 1976. Sec. 2001(b) (as in effect during the years in issue). For purposes of sec. 2001(b), the term "adjusted taxable gifts" means the total amount of the taxable gifts (within the meaning of sec. 2503) made by the decedent after Dec. 31, 1976, other than gifts which are includable in the gross estate of the decedent. The term "taxable gifts" means the sum of the values of the gifts made during the taxable period, less annual exclusions and less certain deductions. Sec. 2503. Sec. 2504(c) provides that, for gift tax purposes, if the valuation of a gift made in a preceding calendar year or quarter is at issue, and if the statutory period within which an assessment may be made with respect to the gift has expired and a tax has been assessed or paid for such preceding calendar year or quarter, then the value of such prior gift shall be the value that was used in computing the tax for the last preceding calendar year or quarter for which a gift tax was assessed or paid. However, there is no similar time limit on the correction of erroneously valued prior taxable gifts (adjusted taxable gifts) for estate tax purposes.

the taxpayer retained legal title to the stock as security for payment of the purchase price. In addition, letter agreements were drawn up that provided that if the IRS ever determined that the fair market value of the stock as of the time of transfer was greater or less than the purchase price, the price would be adjusted to the fair market value determined by the Service. The IRS subsequently determined that the stock was worth $16 per share and that there was due a gift tax on the value in excess of the face amount of the notes. It appears that the taxpayer and the trusts made no attempt to make a price adjustment, but the adjustment would have been an empty formality, since the trust corpus—shares in the corporation, which was bankrupt by the time of trial—was worthless.

The Tenth Circuit in *King* held that the transfers were not subject to the gift tax because there was no donative intent and because the sales were made in the ordinary course of business at arm's length. Generally, if property is transferred for less than an adequate and full consideration in money or money's worth, the excess of the value of the property transferred over the value of the consideration received "shall be deemed a gift." Sec. 2512(b). However, section 25.2512-8 of the Gift Tax Regulations provides that "a sale, exchange, or other transfer of property made in the ordinary course of business (a transaction which is bona fide, at arm's length, and free from any donative intent), will be considered as made for an adequate and full consideration in money or money's worth." Relying on the regulation, the court held that the price adjustment clause eliminated the possibility of donative intent because, when the IRS determined that the stock was worth $16 per share, the trusts became obligated to pay the higher price. The court upheld the District Court's finding that the parties inserted the price adjustment clause only because it was difficult, if not impossible, to accurately value the stock at the time of its transfer. The court also stated that the gift tax is intended to prevent taxpayers from using gifts to reduce their taxable estates and, consequently, found it significant that the taxpayer's estate was in no way diminished by the transfer of stock to the trusts (apparently, because the stock had since become worthless).

The factual findings supporting the holding in *King* are open to question (*Harwood v. Commissioner*, 82 T.C. at 271 n. 23),[13] but, in any event, the case is distinguishable because no arm's-length sale was involved here. We disagree with the petitioners' contention that because it attempts to overcome the difficulties associated with the valuation of closely held stock, the gift adjustment agreement is like that in *King*; the adjustment clause in *King* operated to insure that no unintended gift was made, but the agreement here purports to retroactively alter the amount of an otherwise completed gift. Furthermore, since there is no assurance that the petitioners will either recover the excess shares or, at the time of their deaths, possess the power to recover such shares, and since the shares are not worthless, the petitioners' estates may be reduced by the transfer of the shares. See *Harwood v. Commissioner*, 82 T.C. at 275 n. 28.

Accordingly, we conclude that the gift adjustment clause involved here is void as contrary to public policy and has no effect on the gift taxes otherwise due on the gifts of stock to the petitioners' sons.

*Decision will be entered under Rule 155.*

---

[13] In *Harwood v. Commissioner*, 82 T.C. 239, 271 n. 23 (1984), affd. in an unpublished opinion 786 F.2d 1174 (9th Cir. 1986), we made the following observation:

"We question whether the buyer's willingness to pay whatever amount the IRS determined the stock to be worth evidences an arm's-length transaction. If anything, it tends to show that the trustee did not bargain at arm's length with the trust grantor, since the trustee evidently did not care what price it paid for the stock, but cared only that no gift tax be incurred by the grantor-seller."